**IN THE CIRCUIT COURT
FOR BALTIMORE CITY**

| | | |
|---|---|---|
| TERRELL CORBITT, an individual, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. **1:20-cv-03431-RDB** |
| v. | ) | |
| | ) | |
| BALTIMORE POLICE DEPARTMENT; | ) | **SECOND AMENDED** |
| PHILIP LIPPE; EUGENE COKER; | ) | **COMPLAINT** |
| CAMERON CATRON; CATHAL LUDDY; | ) | |
| BRIA LYLES; AARON JACKSON; BRYANT | ) | |
| JONES; LAKISHA FEASTER; CHRISTOPHER | ) | |
| FLORIO; DEVIN YANCEY; GAREY DYER; | ) | |
| JAMES KLEIN; WALTER H. NAYLOR III; | ) | |
| JONATHAN JONES;  STEVEN MCDONALD; | ) | |
| LINDSON AGELLA; TIMOTHY BARDZIK; | ) | |
| COMMISSIONER KEVIN DAVIS; CHIEF T.J. | ) | |
| SMITH; JOSEPH ALLEN; MAUSEAN | ) | |
| CARTER; DOE DEFENDANTS 1-20 | ) | |

## SECOND AMENDED COMPLAINT

Plaintiff, TERREL CORBITT, an individual and resident of the state of Maryland, by and

through his attorneys, hereby states his Second Amended Complaint for negligence and violation

of his state Constitutional rights against the Defendants, BALTIMORE POLICE DEPARTMENT

("BPD"); SHRINA N. FLEMMING; SGT. RICHARD PURTELL; RONALD ZAMORA; PHILIP

LIPPE; EUGENE COKER; CAMERON CATRON; CATHAL LUDDY; BRYANT JONES;

LAKISHA FEASTER; DEVIN YANCEY; GAREY DYER; JAMES KLEIN; BRIA LYLES;

AARON JACKSON; WALTER H. NAYLOR III; JONATHAN JONES; STEVEN

MCDONALD; LINDSON AGELLA; TIMOTHY BARDZIK; COMMISSIONER KEVIN

DAVIS ("DAVIS"); CHIEF T.J. SMITH ("SMITH"); JOSEPH ALLEN ("ALLEN"); MAUSEAN CARTER ("CARTER"); and certain unknown Doe Defendants ("Does") as follows.

## INTRODUCTION

1.   On December 15, 2017, Plaintiff Terrell Corbitt and his friend Joseph Allen were driving to a Home Depot in West Baltimore to run an errand.

2.   A short distance away, Baltimore Police Officers were engaged in the high-speed pursuit of a criminal suspect, Defendant Mausean Carter, after Carter had fled a traffic stop. Carter soon began discharging weapons from his moving vehicle at pursuing officers while they drove through traffic-filled streets of residential areas in West Baltimore.

3.   Despite radio alerts from pursuing officers that shots had been fired, consistent high rates of speed, traffic, school zones, numerous blown intersections, confirmation of helicopter oversight of the and urging that officers could safely terminate their pursuit, over fifteen police vehicles joined in, and continued the pursuit for over ten minutes and across miles of the city.

4.   At least one, and possibly two chasing officers discharged their firearms from their moving police vehicles at Carter during the chase, creating a crossfire and further incentive for Carter to continue his shooting and attempts to evade pursuit. This resulting crossfire caused multiple unnecessary injuries to two innocent bystanders, property of Baltimore residents, and one BPD officer. Plaintiff Terrell Corbitt was one of those bystanders and was struck in the rear left of his head by a bullet.

5.   On information and belief and based upon the fact that Plaintiff was struck from the rear, and that Carter was firing in the direction of the front of Plaintiff's head at the officers, the bullet that struck the Plaintiff likely originated from one of the officers who fired from behind at the suspect.

6.   As a result of Plaintiff's presence in this crossfire, Plaintiff has suffered traumatic brain injury that caused at least one emergent brain surgery, grueling rehab, heavy medication, constant medical care, an ongoing debilitating seizure disorder controlled by implant, constant pain, paralysis of limbs, and loss of autonomy and independence.

## JURISDICTION AND VENUE

7.   This is an action for monetary relief for violation of the Fourth Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983.

8.   This Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction of Plaintiff's state law claims under 28 U.S.C. § 1367.

9.   This Court is the appropriate venue pursuant to 28 USC § 1391(b) because the events and omissions giving rise to the claims occurred in Maryland. Plaintiff resided in this judicial district at all times relevant to this Second Amended Complaint, the majority of Defendants reside in this judicial district, and the events and omissions giving rise to Plaintiffs' claims occurred within this judicial district.

10. On or about February 20, 2018 Plaintiff provided notice of his claim against the state of Maryland to the Treasurer. On or about February 20, 2018, pursuant to the notice requirements of the Local Government Tort Claim Act, Plaintiff also provided notice of his to the City Comptroller and Baltimore Police Commissioner Darryl Desousa.

## PARTIES

11. Plaintiff Terrell Corbitt is an individual and resident of the state of Maryland and was a resident of the state of Maryland at all times relevant to this Second Amended Complaint.

12. The Baltimore City Police Department ("BPD") is an agency of the state of Maryland. The BPD is responsible for conducting criminal investigations and apprehensions in a reasonable

manner to protect the life and well-being of Maryland residents. Through its policy-making officers, including Davis and Smith, BPD creates, implements, and ratifies policies, practices, habits, customs and procedures, and for training and supervision of officers regarding apprehension of suspected criminals, particularly of those during high-speed car chases. As an agency of the state of Maryland, BPD acted under color of state law at all times relevant to this Second Amended Complaint.

13. PHILIP LIPPE ("Lippe") is an employee of the BPD and, on information and belief, a resident of the state of Maryland. At all times relevant to this Second Amended Complaint, Lippe initiated the emergency pursuit of Defendant Mausean Carter on 12/15/17 and acted pursuant to established policy and training of the BPD regarding car chases. Lippe is sued in his individual capacity.

14. EUGENE COKER ("Coker") is an employee of the BPD and, on information and belief, a resident of the state of Maryland. At all times relevant to this Second Amended Complaint, Coker personally participated in the emergency pursuit of Defendant Mausean Carter on 12/15/17 and acted pursuant to established policy and training of the BPD regarding car chases. Coker is sued in his individual capacity.

15. CAMERON CATRON ("Catron") is an employee of the BPD and, on information and belief, a resident of the state of Maryland. At all times relevant to this Second Amended Complaint, Catron personally participated in the emergency pursuit of Defendant Mausean Carter on 12/15/17 and acted pursuant to established policy and training of the BPD regarding car chases.. Catron is sued in his individual capacity.

16. CATHAL LUDDY ("Luddy") is an employee of the BPD and, on information and belief, a resident of the state of Maryland. At all times relevant to this Second Amended Complaint, Luddy

personally participated in the emergency pursuit of Defendant Mausean Carter on 12/15/17 and acted pursuant to established policy and training of the BPD regarding car chases. Luddy is sued in his individual capacity.

17. BRYANT JONES ("Jones") an employee of the BPD and, on information and belief, a resident of the state of Maryland. At all times relevant to this Second Amended Complaint, Jones personally participated in the emergency pursuit of Defendant Mausean Carter on 12/15/17 and acted pursuant to established policy and training of the BPD regarding car chases. Jones is sued in his individual capacity.

18. LAKISHA FEASTER ("Feaster") an employee of the BPD and, on information and belief, a resident of the state of Maryland. At all times relevant to this Second Amended Complaint, Feaster personally participated in the emergency pursuit of Defendant Mausean Carter on 12/15/17 and acted pursuant to established policy and training of the BPD regarding car chases. Feaster is sued in her individual capacity.

19. CHRISTOPHER FLORIO ("Florio") an employee of the BPD and, on information and belief, a resident of the state of Maryland. At all times relevant to this Second Amended Complaint, Florio personally participated in the emergency pursuit of Defendant Mausean Carter on 12/15/17 and acted pursuant to established policy and training of the BPD regarding car chases. Florio is sued in his individual capacity.

20. DEVIN YANCEY ("Jones") an employee of the BPD and, on information and belief, a resident of the state of Maryland. At all times relevant to this Second Amended Complaint, Yancey personally participated in the emergency pursuit of Defendant Mausean Carter on 12/15/17 and acted pursuant to established policy and training of the BPD regarding car chases. Yancey is sued in his individual capacity.

21. GAREY DYER ("Dyer") an employee of the BPD and, on information and belief, a resident of the state of Maryland. At all times relevant to this Second Amended Complaint, Dyer personally participated in the emergency pursuit of Defendant Mausean Carter on 12/15/17 and acted pursuant to established policy and training of the BPD regarding car chases. Dyer is sued in his individual capacity.

22. JAMES KLEIN ("Klein") an employee of the BPD and, on information and belief, a resident of the state of Maryland. At all times relevant to this Second Amended Complaint, Klein personally participated in the emergency pursuit of Defendant Mausean Carter on 12/15/17 and acted pursuant to established policy and training of the BPD regarding car chases. Klein is sued in his individual capacity.BRIA LYLES ("Lyles") is an employee of the BPD and, on information and belief, a resident of the state of Maryland. At all times relevant to this Second Amended Complaint, Lyles acted pursuant to established policy and training of the BPD regarding car chases. Lyles is sued in her individual capacity.

23. AARON JACKSON ("Jackson") is an employee of the BPD and, on information and belief, a resident of the state of Maryland. At all times relevant to this Second Amended Complaint, Jackson personally participated in the emergency pursuit of Defendant Mausean Carter on 12/15/17 and acted pursuant to established policy and training of the BPD regarding car chases. Jackson is sued in his individual capacity.

24. WALTER H. NAYLOR III ("Naylor") is an employee of the BPD and, on information and belief, a resident of the state of Maryland. At all times relevant to this Second Amended Complaint, Naylor acted pursuant to established policy and training of the BPD regarding car chases. Naylor is sued in her individual capacity.

25. JONATHAN JONES ("Jones") is an employee of the BPD and, on information and belief, a resident of the state of Maryland. At all times relevant to this Second Amended Complaint, Jones acted as the lead detective in the shooting of Plaintiff Terrell Corbitt. Jones is sued in his individual capacity.

26. STEVEN MCDONALD ("McDonald") is an employee of the BPD and, on information and belief, a resident of the state of Maryland. At all times relevant to this Second Amended Complaint, McDonald acted pursuant to established policy and training of the BPD regarding car chases. McDonald is sued in his individual capacity.

27. LINDSON AGELLA ("Agella") is an employee of the BPD and, on information and belief, a resident of the state of Maryland. At all times relevant to this Second Amended Complaint, Agella acted pursuant to established policy and training of the BPD regarding car chases. Agella is sued in his individual capacity.TIMOTHY BARDZIK ("Bardzik") is an employee of the BPD and, on information and belief, a resident of the state of Maryland. At all times relevant to this Second Amended Complaint, Bardzik acted pursuant to established policy and training of the BPD regarding car chases. Bardzik is sued in his individual capacity.

28. Defendants referenced in paragraphs 13 through 270 shall be referred to as the "Officer Defendants."

29. COMMISSIONER KEVIN DAVIS ("Davis") was at all times relevant to this Second Amended Complaint an employee and officer of the BPD and, on information and belief, a resident of the state of Maryland. Davis was directly or jointly responsible for creating, implementing, and training officers in BPD policies and practices regarding criminal apprehension through car chases at all times relevant to this Second Amended Complaint. Davis is sued in his individual capacity.

30. CHIEF T.J. SMITH ("Smith") is an employee and officer of the BPD and, on information and belief, a resident of the state of Maryland. Smith was directly or jointly responsible for creating, implementing, and training officers in BPD policies and practices regarding criminal apprehension through car chases at all times relevant to this Second Amended Complaint. Smith is sued in his individual capacity

31. Defendants referenced in Paragraphs 13 through 30 shall be referred to as the "BPD Defendants" for all purposes in this Second Amended Complaint.

32. JOSEPH ALLEN ("Allen") is a resident of the state of Maryland. Plaintiff was sitting in Allen's passenger seat at the time of the high-speed chase at issue. On information and belief, Allen is the holder of an insurance policy which protects or indemnifies all passengers for injury suffered while being transported in Allen's vehicle.

33. MAUSEAN CARTER ("Carter") is a resident of the state of Maryland and was the target of the police chase described herein at all times relevant to this Second Amended Complaint.

34. On information and belief, there are additional Officer and/or Policy-making Defendants who are responsible for Plaintiff's injuries suffered as a result of the inherently dangerous circumstance presented by the car chase at issue, or insurers that are responsible for indemnifying Plaintiff for his injuries, and such parties shall be referred to as the "Doe Defendants" herein. Plaintiff will amend his Second Amended Complaint to state these individuals' and entities' true identities once such information becomes available.

## FACTS

## I. INTRODUCTION

35. The Baltimore City Police Department's implementation of emergency vehicular pursuit (1) caused the serious bodily injury to Plaintiff Terrell Corbitt and (2) is part of a persistent pattern of unconstitutional policing tactics.

36. BPD Policy 1503, effective September 13, 2017, was the controlling vehicular pursuit policy during the incident in this Second Amended Complaint.

37. Policy 1503 was first created in the wake of the Department of Justice Civil Rights Division's investigative report (hereinafter, the "Report") released August 10, 2016.[1] This Report studied BPD policing incidents between 2010-2015 and came to general conclusions that the department was failing because of "deficient policies, training, oversight, accountability, and policing strategies that do not engage effectively with the community the Department serves."[2]

38. The Report evaluated vehicular pursuits during the review period alongside the lack of an explicit excessive force policy and noted that BPD's vehicular pursuits and use of force polices as mutually reinforced one another in a way that endangered the citizens of Baltimore.[3]

39. The Report implored BPD to amend their controlling policy on vehicular chases, then known as General Order 11-90, to mirror the language of the widely accepted International Association of Chiefs of Police (IACP) model policy in order to comply with constitutional standards.[4]

40. The Report specifically noted BPD's troubling practical application of General Order 11-90 as it related to officers being allowed to shoot at suspects from their moving vehicles. It

---

[1] U.S. Department of Justice, Civil Rights Division, *Investigation of the Baltimore City Police Department*, (August 10, 2017), available at https://civilrights.baltimorecity.gov/sites/default/files/20160810_DOJ%20BPD%20Report-FINAL.pdf.

[2] *Id.* at 163.
[3] *Id.* at 92-96.
[4] *Id.* at 97.

deemed this permissiveness "potentially unconstitutional," especially when officers fired at vehicles fleeing away from them.[5]

41. The Report noted that if a driver-suspect was shot while driving during a high-speed chase they could likely lose control of the vehicle and endanger the surrounding public. The Report also mentioned how difficult it was to accurately shoot at moving targets while in motion, further causing potential misfire into innocent communities.[6] The Report said that common practice should be that even when vehicles were charging officers, they should not shoot at them but rather move out of the way to avoid unnecessary injury of themselves or others.[7]  Overall, the Report characterized shooting out of moving vehicles as force tactics that were "highly dangerous" and "ineffective" to stop fleeing suspect vehicles.[8]

42. The Report effectively notified BPD of changes that must be made to remedy its unconstitutional conduct. As a result, BPD issued Policy 1503 on September 13, 2017, which mirrored some of the language referenced in the Report.

43. The language of Policy 1503 was changed in November 2019, after Plaintiff was shot on his way to Home Depot.

44. Although the language of BPD's emergency vehicular chase policy has changed over the last ten years, the custom, practice, and culture within BPD regarding initiation and continuation of emergency has proliferated a deadly pattern of vehicular pursuits ending the innocent lives of Black bystanders, particularly in West Baltimore.

---

[5] *Id.*
[6] *Id.*
[7] *Id.*
[8] *Id.*

45. BPD has spent these past ten years trying to justify, in courts of law, why their controlling relative policy and practice of vehicular pursuits at the time of the incident met the threshold of constitutionality, despite it killing innocent bystanders:

- **Elbert Davis**, an 86-year-old beloved grandfather who was driving lawfully with his wife (who was also seriously injured in the crash) down a street in the Grove Park neighborhood of West Baltimore in 2010 when a suspect being eluded by police crashed into their car.
- **Jordasha Rollins**, a 22-year-old mother driving lawfully in West Baltimore with her daughter who was two-weeks shy of her first birthday (and also critically injured in the crash) were fatally struck when a suspect being chased by police ran a red light and crashed into them one night in 2012.
- **Angel Chiwengo**, a 46-year-old mother being lawfully driven in 2013 to her daughter's house to watch her give birth when a car being pursued by police crashed into them, killing her and the two suspects being pursued and critically injuring Ms. Chiwengo's co-worker who was driving her at the time.
- **Jeremiah Darrin Perry**, a 1-year-old boy sitting in his stroller on a public sidewalk as he, his mother, and grandmother waited for the bus in 2015 when a suspect being pursued crashed into him and killed him instantly.
- **Darrius Gore**, a 28-year-old Baltimore man who was lawfully driving home with a friend (who was also seriously injured in the crash) when a suspect being pursued crashed into his vehicle and he spent a month in a coma fighting for his life alone due to COVID-19 restrictions on hospital visitation, and ultimately died without any of his family being able to say goodbye in 2020.

## II.  THE PURSUIT OF MAUSEAN CARTER ON DECEMBER 15, 2017 BY BPD AND RESULTING PERMANENT INJURY OF PLAINTIFF

46. Plaintiff Terrell Corbitt is yet another Black Baltimore resident whose life was materially altered as a result of BPD's customs and practices in conducting vehicular pursuits over the past ten years.

47. Plaintiff was permanently physically and mentally injured after BPD officers engaged a suspect, Defendant Mausean Carter, in a dangerous vehicular pursuit on December 15, 2017, which included multiple rounds of gunfire between officers in their moving vehicles Carter over a twenty-minute chase through residential West Baltimore neighborhoods. This crossfire created between BPD and Mr. Carter resulted in the shooting of not only Mr. Corbitt, but also BPD

Officer Cathal Luddy, and an eye injury to another innocent bystander resulting from shattered glass and extensive damage to his car. In news coverage of the chase at least one witness was interviewed and described the terror of thinking they were going to be shot as gunfire rang out.[9] A local business, a parked vehicle, and a West Baltimore residence also sustained gunshot damage from either police discharges or Mr. Carter during the chase. The final tally of bullets collected from those expelled from any moving vehicle involved in the chase was about twenty.

48. Plaintiff was innocently riding in the back seat of an acquaintance's car between errands when two bullets ripped through the side of the vehicle he was riding in. One of the bullets entered the right hemisphere of his skull and fragmented in his brain tissue. The other grazed his head in a narrow miss.

49. Corbitt survived and was rushed into emergency brain surgery. This surgery narrowly saved his life, but speaking with him and his family today, the life saved hardly resembles the one taken from him on December 15, 2017.

50. Corbitt suffered severe and persistent brain injury as a result of being shot. He initially woke from his first brain surgery from a coma. When he awoke, he could not talk, or perform basic physical functions. Eventually doctors confirmed that his entire right arm and hand (his dominant) were permanently paralyzed and cause him persistent stiffness and pain to this day.

51. Corbitt's recovery continued after three weeks in the hospital when he was transferred to a traumatic brain injury rehab facility. There he spent thirty days doing daily painful and arduous physical therapy lessons to re-learn how to use his body and speak.

52. He still, over three years later, moves, thinks, and speaks incredibly slowly. His balance is permanently impaired and he can easily trip and fall. Paralysis in his right hand forces him to

---

[9] *Baltimore Police Arrest 'Shooting Spree' Suspect After Pursuit Through City*, CBS Baltimore (WJZ) (Dec. 15, 2017), https://baltimore.cbslocal.com/2017/12/15/baltimore-police-chase-suspect-city/.

try (unsuccessfully) to write with his non-dominant left hand.  Because of his impaired memory, and gait his family usually must accompany him anytime he leaves the house because they worry about him remembering the way home or tripping and falling.

53. Corbitt has not only experienced one major brain surgery and its long recovery, but also developed an extremely severe, and almost fatal, seizure disorder.

54. Once discharged from the rehab center and home, Corbitt almost immediately experienced a grand mal seizure. He was subsequently hospitalized for two weeks where doctors conducted extensive brain mapping and noticed there were still small fragments of the original bullet lodged in his brain. With another major brain surgery decidedly too risky, Corbitt experienced between two and three more severe seizures requiring hospitalization after returning home from the hospital this most recent time. He was put on large doses of medications that caused constant brain fog and extreme drowsiness, such that during these years he became essentially non-responsive.

55. Despite these medications controlling his seizures he was still having to visit his neurologist upwards of every three weeks from excruciating headaches and repeated seizures.

56. In 2020 Corbitt finally was able to have a surgical proceudre to control his seizures called a Vagus Nerve Stimulator (VNS) implantation. The implanted machine functions like a pacemaker, similarly placed in the chest wall, and programmed by a doctor to stimulate the vagus nerve in the neck and eliminate seizure symptoms and damage.

57. After the surgery his neurologist read the stimulator to see how often it was activating from seizures and noted that he was having a disturbing 80-150 seizures a day. Because of his implant he must receive regular (quarter-annual) care from his neurologist for the rest of his life.

58. Corbitt has unfortunately never fully regained control over his speech and brain function such that he can hold a lasting and meaningful full conversation. His speech is slow, memory shaky, and he is often confused and frustrated.

59. Corbitt's memory function is permanently impaired in both the short and long-term starting at the period when the accident happened.

60. Corbitt's sister, with the occasional help from other family members, is his main caretaker. Multiple times she became emotional as she described him as a "shell" of what he used to be. She explained that who he is today lacks his humor and personality from before the accident.

61. Mr. Corbitt's ongoing recovery includes constant pain since the accident which he commonly rates as a 9 out of 10.

62. Beyond physical pain Corbitt has suffered mentally. His friends have slowly fallen off and he no longer maintains any type of social life. He had a girlfriend at the time of the accident but soon the task of caring for him became too burdensome, and they separated.

63. Corbitt has also lost all his independence and autonomy. He lives in West Baltimore in his family home with other relatives who assist round-the-clock with his medical and practical daily care. His sister has accommodated her personal life and work schedule around caring for him.  She estimates that she averages anywhere between six and twelve hours every three months taking him to his various doctors.

64. Corbitt can no longer drive a car, nor can he manage public transportation as means to get around.

65. Professionally. Corbitt will never work again. He receives disability payments under 100% disability coverage due to the seriousness of his injury, resulting permanence and inherent

effect. He stresses that work is what he misses the most from his life prior to the shooting. He was a thriving electrician, roofer, carpenter, and all-around talented handyman for various apartment buildings around Baltimore and worked steadily for the same family-owned property management company for twenty-two years prior to the accident.

66. Corbitt will never recover from the trauma resulting from the decision by BPD officers to engage in a shootout from their moving vehicles on December 15, 2017. He has been unconstitutionally denied the substantive right of life and liberty so written into the 14th Amendment of the Constitution. His physical and mental pain resulting from his injury is never-ending, and he has certainly, along with those who love and care for him, been unjustly denied the full autonomous life he once enjoyed.

67. The pursuit of Mausean Carter, subject to BPD Policy 1503 (effective September 13, 2017) perpetuated a historically deadly pattern of excessive and disproportionate force at the expense of public safety similar to General Order 11-90.

68. On December 15, 2017, Officer Defendant Lippe detained Mr. Mausean Carter at a traffic stop on Reisterstown Road because the window tinting on his automobile exceeded legal limits.[10] Upon returning to his police vehicle, Lippe discussed his suspicion with another BPD officer and with BPD dispatch that Carter's vehicle resembled one that BPD were searching for in connection with recent homicides.[11] While on the line with both his supervisor (Lieutenant) and BPD homicide and citywide dispatches, his Lieutenant authorized him to investigate further by having Carter exit the vehicle so that the officer could perform a search.[12]

---

[10] Baltimore Police, *Pursuit Active Shooter 12.18.17*, YouTube (Dec. 18, 2017), https://m.youtube.com/watch?v=3n56-_UnLN8.
[11] *Id.*
[12] *Id.*

69. The detaining Officer Defendant followed instruction from the Lieutenant, approached Carter's car and asked him to exit the vehicle.[13] Carter immediately fled the scene at a high rate of speed.[14] The detaining Officer Defendant and his backup officer immediately ran to their cars and in a matter of seconds engaged in a vehicular pursuit of Carter northbound on Reisterstown Road.[15]

70. Less than one minute into the chase Carter turned onto Gwynns Falls Parkway and began firing shots at Officer Defendant Lippe's vehicle.[16] Lippe relayed information, pursuant to Policy 1503 regarding their chase location and the presence of shots fired to BPD dispatch officers.[17] BPD dispatch officers promptly informed all officers that Carter had a rifle in the car, there was a pursuit happening, and a BPD helicopter located the pursuit and took over calling out the movements.[18]

71. BPD helicopter surveillance tracked Carter's trajectory during the pursuit and relayed all information regarding the pursuit to all involved officers as it happened in real time.[19] While pursuing Carter eastbound on Gwynns Falls Parkway, one of the Officer Defendants announced that Carter was again firing at pursuing police vehicles out of his car while passing multiple high schools.[20] The helicopter informed all Officer Defendants over dispatch to exercise care because of the shots fired and also told officers to watch intersections as they pursed at a high-rate of speed.[21]

---

[13] *Id.*
[14] *Id.*
[15] *Id.*
[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] *Id.*
[21] *Id.*

72. At one point after the officers got so close to Carter's vehicle that they made contact and caused his back bumper to fall off.[22] Minutes later, officers warned that Carter was aiming his gun at them and that shots had again been fired.[23] Carter then nearly collided with a bystander vehicle traveling on a residential street and again officers warn of Carter pulling his gun on them.[24]

73. Helicopter instructed officers that they could pull back if they didn't feel safe, and that the helicopter would continue to follow Carter and note his location for apprehension.[25] Helicopter dispatch then instructed police vehicles trailing Carter to keep their distance and at one point a police vehicle loses control and ends up on a residential sidewalk to avoid colliding head on with a third-party car traveling lawfully down the narrow street.[26]

74. BPD knew that proximity to the vehicle was inherently unsafe and dangerous and that the rate of speed they were traveling down residential roads was dangerous. Carter not only fired while passing schools and down residential streets but also passed school busses on the road.[27] He and the officers following him sped past multiple pedestrians on the street, passed numerous cars and through heavy traffic, passed through upwards of thirty intersections, traveled down roads in the incorrect direction, maintained speeds of over 90 miles per hour, and engaged in the pursuit for over six minutes with more and more officers joining as time went on.[28]

75. During the chase, at least one of the Officer Defendants returned fire at Carter's vehicle; a press conference the following day with Police Chief Smith and Commissioner Davis confirmed

---

[22] *Id.*
[23] *Id.*
[24]*Id.*
[25] *Id.*
[26] *Id.*
[27] *Id.*
[28] *Id.*

a 12-year veteran of the force had fired three rounds at Carter from his moving vehicle and missed the suspect.[29]

76. Carter's vehicle eventually broke down from the duration and speed of the chase, gunfire, and being struck by a police vehicle at one point. He was finally apprehended when his girlfriend ran across Gwynns Falls Parkway at the 1800 block and tackled him out of the car.[30] At this point there were over nine police vehicles chasing him that had joined pursuit of over the more than six minutes of active pursuit.[31]

77.  Police engaged in a lengthy pursuit of Carter at with such excessive force that their gunfire exchange struck Plaintiff Terrell Corbitt while he was traveling as a passenger in a car driving down Wabash Road. Mr. Corbitt was struck once in the head, with a second bullet narrowly missing him.

78. This vehicular pursuit ignored most of the factors for consideration before initating an emergency chase contained in Policy 1503, and yet an officer could still interpret this chase as policy-compliant because of the wide discretion given to officers under Policy 1503.

79. Such pursuits, as we have seen here, come at the cost of innocent life and were not necessary when there are other means of apprehension such as the helicopter trailing Carter the entirety of the chase. Indeed, the ability to apprehend the suspect by other means is one of the factors BPD officers are directed to consider before initiating an emergency chase, but this factor was ignored.

---

[29] Baltimore Police, *BPD Press Conference 12/18/2017 Part 1*, YouTube (Dec. 18, 2017), https://m.youtube/watch?v=-nwFFwmOBa0&ab_channel=BaltimorePoliceBaltimorePolice.
[30] Baltimore Police, *Pursuit Active Shooter 12.18.17*, YouTube (Dec. 18, 2017), https://m.youtube.com/watch?v=3n56-_UnLN8.
[31] *Id.*

80. Carter would not have exchanged rampant gunfire with police if not provoked by the totally unnecessary and highly dangerous chase.

### III. CHANGES TO POLICE DEPARTMENTS' UNCONSTITUTIONAL EMERGENCY VEHICLE PURSUIT POLICIES ARE PART OF A NATIONAL TREND.

81. Nationwide law enforcement vehicular pursuits are so deadly to innocent civilians that Federal Government Agencies have investigated and offered guidance on their deadly practices in recent years.

82. Collectively, local U.S. Police Departments have borne a painful and widespread pattern of innocent civilian fatalities and/or incidents resulting in their serious bodily harm from their practices of vehicular police pursuits.

83. The Department of Justice recently analyzed statistics of such vehicular police pursuits in a 2017 Report[32] and attributed the data as a result of controlling municipal polices.

84. Between 1996-2015 more than 6,000 fatal pursuit-related crashes occurred (7,090 exactly); resulting in an average of 355 persons (approximately 1/day) killed annually.[33] Of this figure, 277 were of non-occupants or innocent civilians not involved in the chase.[34]

85. The above figure is not even wholly indicative of how deadly such pursuits are; Geoffrey Alpert, a professor of criminology at the University of South Carolina who has studied police pursuits since the 1980s, says the actual figure is likely "three or four times higher."[35]

86. In 2004, researchers analyzed 7,430 deaths resulting from vehicular chases and reported that innocent bystanders make up nearly one third of all deaths resulting from such high-speed

---

[32] Brian A. Reaves, *Police Vehicle Pursuits 2012-2013,* U.S. Department of Justice, 1 (2017).
[33] *Id.* at 6.
[34] *Id.* at 13.
[35] Thomas Frank, *High-speed police chases have killed thousands of innocent bystanders*, USA Today (Jul. 30, 2015 5:56 P.M.), http://usatoday30.usatoday.com/news/nation/2010-04-22-police-chase-deaths_N.htm.

police chases.[36] This statistic does not take into account the number of innocent bystanders who have suffered bodily injury from these chases. Between 2009-2013 two serious injuries occurred per 100 vehicle pursuits, and 21% of the time the injury was sustained by an innocent person.[37]

87. Each version of the BPD vehicular pursuit policy and its implementation affirm a disturbing trend of death and/or serious bodily injury to innocent Baltimore citizens; particularly in Black neighborhoods and to the Black residents of them.

88. Maryland had 81 total pursuit-related fatalities between the years of 1996-2015.[38] Of those, four were innocent bystanders.[39]

89. This data cannot possibly account for all innocent civilian deaths (and deaths in general) resulting from Maryland's use of vehicular police pursuits during that time. In fact, following national pressure to manage unconstitutional police practice resulting in civilian death, all local law enforcement agencies in Maryland are now required by the Governor to provide comprehensive annual reports that identify any deaths that occurred as a result of actions (or omissions) by any police officer.[40]

90. Beginning in 2015 when the data was first reported and up until 2019, at least thirty Maryland citizens have lost their lives to police pursuits; seven of which were innocent bystanders.[41] Out of these thirty deaths, five of them (so far) were directly attributable to the

---

[36] Zachary Crockett, *The Case for Banning High-Speed Police Chases*, Priceonomics (Jul. 22, 2015), https://priceonomics.com/the-case-for-banning-high-speed-police-chases/.
[37] *Reaves, supra,* at 7.
[38] Reaves, at 13.
[39] *Id.*
[40] Md. Stat. Analysis Ctr., Governor's Off. of Crime Control & Prevention, *Reports to the State of Maryland under HB 954* (2015-2019), http://goccp.maryland.gov/reports-publications/law-enforcement-reports/deaths-involving-law-enforcement/; *See also Simmons v. Baltimore City Police Department;* No.: 1:21-cv-009690RDB, 12 (D. Md. filed 2020).
[41] *Id.*

BPD.[42] Between 2012-2021 Baltimore citizens filed six distinct lawsuits against the BPD, *et. al.*

for fatalities of innocent Black bystanders resulting from their vehicular pursuit practices:

> a. *Halloway-Johnson v. Beall, et al.*; 2012; Case No.: 24-C-11002394, Cir. Ct. for Balt. City.
> b. *Yolanda Williams, et al. v. Mayor and City Council for Baltimore City;* 2015; Case No.:24-C-15-0000935, Cir. Ct. for Balt. City.
> c. *Ntambo Ciwengo, et al. v. Estate of Terrell Young, et al.;* 2017; Case No.: 24-C-15005795; Cir. Ct. for Balt. City.
> d. *Shirley Johnson, et al. v. Umar Burley, et al.;* 2020; Case No. 24-C-13002083; Cir. Ct. Balt. City & *Shirley Johnson, et al. v. Baltimore Police Department.;* 2020; Case No. 24-C-13002083; D. Md.; under both cases the facts are the same.
> e. *Smallwood, et. Al. v. Off. Joseph Kamberger, et al.*; Case No.: 24-C-17-005327; Cir. Ct. Balt. City.
> f. *Simmons v. Baltimore City Police Department, et al.;* 2021; Case No.: 1:21-cv-009690RDB; D. Md.

91. These examples of recent adjudication for fatalities of Black Baltimore residents do not reflect cases, such as this one stated in this Second Amended Complaint, where BPD vehicular pursuits resulted in the serious bodily injury to an innocent Black bystander. These cases are thus only a small sample of BPD's policy, custom, and practice of vehicular pursuits that have fundamentally in their collective failure harmed Black Baltimore residents over time.

### FIRST CAUSE OF ACTION
### Bodily Injury by Negligent Operation of Automobile – Against Ins. Co. Defendants

92. Plaintiff incorporates and adopts each allegation contained in the preceding and subsequent paragraphs of this Second Amended Complaint, as if full set forth herein.

93. Plaintiff suffered injury as a result of either Carter, or the Officer Defendants' negligent operation of their vehicles, and which occurred while Plaintiff was a passenger in Allen's automobile. Plaintiff's injury was an "accident" within the meaning of Allen's insurance policy.

---

[42] *Id.*

94. As a passenger in Allen's automobile, Plaintiff is entitled for indemnification of his injuries and costs from the automobile insurance policy issued to Allen.

## SECOND CAUSE OF ACTION
### Battery – Against Carter and Officer Defendants

95. Plaintiff incorporates and adopts each allegation contained in the preceding and subsequent paragraphs of this Second Amended Complaint, as if fully set forth herein.

96. Both Carter and the Officer Defendants intentionally discharged their weapons from moving vehicles.

97. Plaintiff was struck either by a shot from Carter or by the Officer Defendants without his consent.

98. Plaintiff's injuries described in this Second Amended Complaint were caused by the gunshot wound he suffered as a result of the firefight between the Officer Defendants and Carter.

## THIRD CAUSE OF ACTION
### 42 U.S.C. §1983 CLAIM (*Officer Defendants*)
### Violation of the 14th Amendment

99. Plaintiffs incorporate and adopt each allegation contained in the preceding and subsequent paragraphs of this Second Amended Complaint, as if fully set forth herein.

100.     42 U.S.C. §1983 provides that: "Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected to any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit, in equity, or other appropriate proceeding for redress…"

101.     The Officer Defendants at all times relevant to this action were acting under color of state law as agents of the Baltimore Police Department.

102.     Plaintiff has a clearly established right to bodily integrity under the Fourteenth Amendment. Civilian injury during an inherently dangerous police chase has been established as a violation of the Fourteenth Amendment.

103.     On December 15, 2017, Officer Defendants engaged in a high-speed chase in an attempt to apprehend a suspect alleged to have committed several drive-by-shootings in the days prior to the chase.

104.     Officer Defendant's knew or should have known that: (1) the suspect was armed and dangerous; (2) high-speed chases pose a significant risk to innocent by-standers and drivers; (3) continuing to pursue the suspect is likely to cause them to drive more carelessly and increase safety risks to the public in the vicinity, (4) air support had full visual of the suspect at the time of the chase, and (5) they were in possession of the alleged suspect's name, address, and date of birth.

105.     By engaging in and continuing a high-speed police chase Officer Defendants created and increased the risk of danger to innocent bystanders and vehicle passengers in the vicinity of the chase, including Plaintiff. This risk was especially heightened after the suspect shot from his vehicle at officers, who responded by shooting from their police cars at the suspect.

106.     Officer Defendants' conduct by initiating the police chase, continuing the chase, and shooting outside police vehicles display a reckless disregard for Plaintiff's right to bodily integrity. Plaintiff is now partially paralyzed for the rest of his life.

**FOURTH CAUSE OF ACTION**
**42 U.S.C. §1983 CLAIM (*Against BPD*)**
**Violation of the 14th Amendment – *Monell* Liability (Express Policy Claim)**

107.     Plaintiff re-alleges this Fourth Cause of Action only to preserve his rights to appeal. Plaintiff acknowledges that this claim has been dismissed by the Court in its March 22,

2022 Order. Plaintiff incorporates and adopts each allegation contained in the preceding and subsequent paragraphs of this Second Amended Complaint, as if fully set forth herein.

108.      DPSCS Policy 1503 as implemented September 13, 2017 is an express policy instituted by then-Commissioner Davis.

109.  Policy 1503 states, *inter alia*, that officers shall *not* fire any weapon from or at a moving vehicle, "except to counter an imminent threat of death or serious physical injury to the member or another person, by a person in the vehicle using means other than the vehicle."[43]

110.  The language of Policy 1503 thus does not expressly prohibit the use of force described in this Second Amended Complaint despite its unconstitutional threat to the safety of the public and its contravention of the U.S. Constitution's 14th Amendment.

111.  Such use of force has been found by the court to be disproportionate when a vehicle is fleeing officers, and even when it is facing officers because the act of shooting a driver while engaged in a chase is extremely dangerous given the potential loss of control of the vehicle being driven by the suspect.

112.  The language of Policy 1503 says any BPD officer engaging in a pursuit must consider (but is not required) a set of specific enumerated factors before engaging in a chase such as: 1) the nature and seriousness of the offense; 2) current road or environmental conditions; 3) their familiarity with the area and route; and 4) pedestrian and vehicular density. Further considerations are listed in the Policy, but are not limited to only those enumerated.

113.  By Policy 1503, BPD officers are also allowed broad discretion to "consider" the following factors when deciding to *not* pursue an eluding vehicle: (1) the safety of the public, (2) the pursuing members' familiarity with the area of the pursuit, (3) whether or not the identity of

---

[43] Policy 1503, Emergency Vehicle Operation and Pursuit Policy, effective September 13, 2017.

the suspect has been verified, (4) the performance capabilities of the vehicles used in the pursuit in relation to the speed and other conditions of the pursuit, (5) other persons in or on the eluding vehicle, (6) the availability of other resources, (7) the likelihood of apprehension at a later time.

114.  This language, by omission of controlling language, permits officers to engage in unconstitutional emergency vehicular pursuits without regard for the consequences to any innocent Baltimore resident caught in the midst of pursuit.

115.  The language of Policy 1503 authorizes the use of impermissible, unconstitutional behavior, in the form of excessive force. Due to the explicit authorization of the use of excessive force in populated areas of Baltimore, Mr. Corbitt was shot and paralyzed.

116.     Policy 1503 was the moving force behind the harm sustained by Plaintiff.

### FIFTH CAUSE OF ACTION
### 42 U.S.C. §1983 CLAIM (*Against Davis and Smith*)
### Violation of the 14th Amendment – Supervisory Liability

117.     Plaintiff incorporates and adopts each allegation contained in the preceding and subsequent paragraphs of this Second Amended Complaint, as if fully set forth herein.

118.     At all times relevant to this action, Policymaker Defendants were state actors and a "person" within the meaning of 42 U.S.C. §1983.

119.      In 2016, the Department of Justice released a report regarding BPD's use of force policies. Among the policies discussed in this report, the DOJ noted a lack of BPD policy surrounding whether officers may shoot outside their vehicles when pursuing a suspect. The risk of killing or injuring an innocent bystander when a police officer shoots outside their motor vehicle while in hot pursuit was deemed unreasonable.

120.     On information and belief, the factors for consideration in initiating or refraining from an emergency pursuit listed in Paragraphs 111 and 112, above, were included in the first

iteration of Policy 1503 (promulgated in 2017) in order to address deficiencies in BPD custom and practice identified by the DOJ.

121.     In fact, BPD officers were in the habit of ignoring such factors well before Policy 1503 was issued, and their practice and custom of ignoring such factors was the reason that so many West Baltimore residents had lost their lives or been seriously injured during BPD emergency chases during the years 2010-2020.

122.     Defendants Davis and Smith were on notice of BPD officers' failure to consider the risks posed to civilians when initiating emergency pursuits by virtue of the repeated instances of unnecessary civilian death and injury listed in Paragraphs 44 and 89 of this Second Amended Complaint. Such notice pre-dated the DOJ's 2016 Report.

123.     Defendants Davis and Smith were on notice of BPD officers' failure to consider the risks posed to civilians when initiating emergency pursuits by virtue of the findings of the Report, and by the inclusion of specific factors that should be considered by officers before initiating these pursuits.

124.     Despite this notice, Defendants Davis and Smith failed to correct the behavior of their subordinate officers, whom they were fully aware were engaging in unconstitutional conduct when they initiated emergency vehicular chases. On information and belief, no BPD officer was disciplined for initiating any of the emergency chases listed in this Second Amended Complaint, nor were any officers disciplined for their failure to consider factors indicating heightened risk to Baltimore citizens.

125.     Defendants Davis and Smith did not train any of the Officer Defendants in how to apply these factors, and permitted the trainings to include patently reckless conduct. Requirements for attendance at the training program was inconsistent, and instead of being

trained on the use of responsible emergency pursuit tactics, officers who attended the training actually spent their training time doing "donuts" in abandoned parking lots.

126.     On information and belief, Defendants Davis and Smith knew the trainings were ineffective and included reckless conduct, but did nothing to correct their subordinates' behavior. Corbitt's injury provided further evidence that training on consideration of mitigating factors was ineffective. Yet, Davis and Smith both publicly declared that the chase causing Carter's injury was compliant with BPD policy.

127.     The acts complained of in this Second Amended Complaint were conducted pursuant to BPD's longstanding policy, custom, and/or practice of ignoring civilian risk when initiating emergency vehicular pursuits.

128.     Defendants Davis and Smith had actual and constructive knowledge that officers failed to abide by the discretionary mitigating factors included in Policy 1503 and knew that officers had routinely ignored the factors when initiating emergency pursuits.

129.     BPD officers' failures to consider the factors outlined in Policy 1503, as well as others suggested by police departments across the nation, posed an unreasonable risk of constitutional injury to citizens, including the Plaintiff.

130.     The chase described in this Second Amended Complaint would not have occurred had the Officer Defendants considered the factors intended to mitigate civilian risk during emergency vehicular pursuits.

131.     The Policymaker Defendants are responsible for implementing and enforcing BPD policy regarding the termination or continuation of emergency vehicular pursuits. Their failure to take action to correct their subordinates' conduct amounted to tacit authorization of officers engaging in emergency chases without consideration of civilian risk.

132.     Defendants Davis, Smith, and other policy-makers who have not been identified implemented a severely deficient and reckless initiative to train BPD officers in the use of Policy No. 1503.

133.     Plaintiff's injury, and further civilian death and injury, was all but guaranteed to occur given the Policymaker Defendants' supervision of BPD officers' unconstitutional emergency chase practices.

134.     Due to Policymaker Defendant's failures described in this cause of action, Plaintiff has suffered the injuries previously described in this Second Amended Complaint.

**SIXTH CAUSE OF ACTION**
**42 U.S.C. §1983 CLAIM (*BPD*)**
**Violation of the 14th Amendment – *Monell* Liability (Failure to Train)**

135.  Plaintiff re-alleges this Sixth Cause of Action only to preserve his rights to appeal. Plaintiff acknowledges that this claim has been dismissed by the Court in its March 22, 2022 Order. Plaintiff incorporates and adopts each allegation contained in the preceding and subsequent paragraphs of this Second Amended Complaint, as if fully set forth herein.

136.  At all times relevant to this action, Policymaker Defendants were state actors and a "person" within the meaning of 42 U.S.C. §1983.

137.  Between the past ten years (2012-2021), multiple lawsuits against BPD and its officers have been brought due to multiple claims of tort action and also violations of the civil rights of innocent bystanders caused during BPD police vehicle pursuits. The discipline, oversight, policymaking, and supervision of officers imposed by the Policymaker Defendants has been insufficient to prevent ongoing constitutional violations across multiple versions of such policy.

138.  BPD was put on notice, in part, of the unconstitutionality of their policies and

ineffective training practices to keep the public safe by the Department of Justice Civil Rights

Division's investigative report issues August 10, 2016.

139.  Furthermore, at least five lawsuits filed between 2012-2015 which alleged tortious

action of the Department and its officers as they conducted multiple vehicular pursuits which

resulted in the death of innocent bystanders also put the Department on notice of their

unconstitutional policy.

140.  On information and belief, the training afforded to BPD officers concerning high speed

vehicular pursuits is inadequate compared to the circumstances they are likely to face in a

densely populated city such as Baltimore.

141.  Previously, under effect of General Order 11-90 which in writing provided strict

guidelines regarding high-speed pursuits, BPD officer Timothy E. Beall killed a motorcyclist

during a high-speed vehicular pursuit. Beall testified under oath that BPD did not provide

extensive training for such pursuits. Specifically, he said his training encouraged him "basically"

not to engage in high-speed pursuits and that there was no substantive training specific to how

officers should conduct these pursuits themselves. He said the training simply consisted of

driving at "high speeds" on a closed course training facility in Maryland where they drove

through "wet road conditions and driving courses with street signs and stop signs." He failed to

remember the length of training and any speeds they reached during practice. Furthermore, he

testified that the practice of General Order 11-90 was "somewhat different" from the written

version and that supervisors often instructed officers to pursue vehicles and continue pursuits

even in violation of the policy. His specific example was the fact that he routinely exceeded

speed limits by 20-25 miles per hour during pursuits despite the policy expressly prohibiting excess of 10 miles per hour.

142.  On information and belief, the deficient training program described by Officer Beall under oath continued from General Order 11-90 through both the 2017 and 2019 versions of Policy 1503.

143.  The Policymaker Defendants' failure to train and discipline was the moving force in Plaintiff's injury. Their actions and/or omissions made it all but certain that Plaintiff or a similarly situated individual would be injured by the actions of BPD Officers.

**SEVENTH CAUSE OF ACTION**
**42 U.S.C. §1983 CLAIM (*BPD*)**
**Violation of the 14th Amendment – *Monell* Liability (Condonation)**

144.  Plaintiff incorporates and adopts each allegation contained in the preceding and subsequent paragraphs of this Second Amended Complaint, as if fully set forth herein.

145.  The 2016 DOJ Report indicates a rampant pattern of excessive force pursuant to Policy 1503. Defendants had actual and constructive knowledge of such violations.

146.  The version of Policy 1503 authorizing the Officer Defendants' conduct was not its current iteration, which has since been modified directly by federal courts pursuant to consent decree.

147.  Over a period of over ten years, multiple lawsuits against the BCPD and its officers have been brought due to violations of citizens' civil rights during police vehicle pursuits. These constitutional violations have occurred without recourse for the officers involved.

148.  The BPD had actual knowledge of the lawsuits against them.

149.  The BPD was notified of multiple lawsuits and civilian injuries/deaths years before the 2016 DOJ Report.

150.  Insufficient or non-existent officer discipline has perpetuated a culture of acceptance and condonation of unconstitutional officer use of force during emergency chases.

151.  The Policymaker Defendants' deliberate indifference towards their officers' misconduct and constitutional violations is evidenced by their failure to take any corrective action in the face of the continuing lawsuits against BPD for civilian injuries and deaths due to officer emergency car chases.

152.  WHEREFORE, Plaintiff, Terrell Corbitt, respectfully request that this Court enter a judgment in their favor and against Defendants BALTIMORE POLICE DEPARTMENT ("BPD"); PHILIP LIPPE; EUGENE COKER; CAMERON CATRON; CATHAL LUDDY; BRYANT JONES; LAKISHA FEASTER; DEVIN YANCEY; GAREY DYER; JAMES KLEIN; BRIA LYLES; AARON JACKSON; WALTER H. NAYLOR III; JONATHAN JONES; STEVEN MCDONALD; LINDSON AGELLA; TIMOTHY BARDZIK; COMMISSIONER KEVIN DAVIS ("DAVIS"); CHIEF T.J. SMITH ("SMITH"); JOSEPH ALLEN ("ALLEN"); MAUSEAN CARTER ("CARTER"); and certain unknown Defendants ("Does") awarding compensatory damages, punitive damages, attorneys' fees and costs against each Defendant, and any other relief this Court deems just and appropriate.

## JURY DEMAND

Plaintiff Terrell Corbitt hereby demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court grants the following relief:

1.  For all damages, $5,000,000.00;

2.  As punitive damages to deter future violations $1,000,000.00;

3.  For attorneys' fees as may be appropriate by law or by statute; and

4.  For such other and further relief as this Court may deem appropriate.


                                              /s/ Fareed Nassor Hayat
                                         Fareed Nassor Hayat, Esq.
                                         THE PEOPLE'S LAW FIRM, LLC
                                         200 E. Lexington St., Suite 1111
                                         Baltimore, MD 21202