# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| | * |
| TERRELL CORBITT, | |
| | * |
| Plaintiffs, | |
| | * |
| v. | Civil Action No. RDB-20-3431 |
| | * |
| BALTIMORE CITY POLICE | |
| DEPARTMENT, *et al.*, | * |
| | |
| Defendants. | * |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## **MEMORANDUM OPINION**

Plaintiff Terrell Corbitt was struck by a stray bullet as Baltimore Police officers engaged in a high-speed car chase, during which the officers exchanged gunfire with a fleeing suspect. Corbitt was riding in the back seat of a car when he was struck in the head with a bullet, which entered the right hemisphere of his skull. (Sec. Am. Compl. ¶ 48, ECF No. 46.) This Court conducted a hearing on May 30, 2023, for arguments concerning Defendants Ofc. Eugene Coker, Ofc. Lakisha Feaster, Ofc. Bryant Jones, Ofc. Jonathan Jones, Det. Philip Lippe, and Ofc. Cathal Luddy's (collectively, "Officer Defendants") Motion to Dismiss Plaintiff's Second Amended Complaint ("Officer Defendants' Motion") (ECF No. 61) and the Baltimore Police Department ("BPD"), Former Baltimore Police Commissioner Kevin Davis, and Former Baltimore Police Chief T.J. Smith's (collectively, "BPD Defendants") Motion to Dismiss Plaintiff's Second Amended Complaint ("BPD Defendants' Motion") (ECF No. 62). (*See*

ECF No. 73.)[1]  In brief, the Officer Defendants urged this Court to take judicial notice of records, and testimony described therein, from a criminal case underlying this matter, which they contend render Plaintiff's claims implausible.  (*See generally* ECF No. 61-6.)  The BPD Defendants argued that, to the extent that the Officer Defendants are successful in dismissing the claim asserting the predicate constitutional violation, Plaintiff's claim for supervisory liability based on that violation must also be dismissed.  (*See* ECF No. 62-1 at 7.)  For the reasons stated on the record on May 30, 2023, the Court DENIED both Motions to Dismiss. (ECF No. 78.)[2]  This Memorandum Opinion supplements the basis for those rulings.

## BACKGROUND[3]

On December 15, 2017, Defendant Officer Philip Lippe detained Mausean Carter at a traffic stop on Reisterstown Road.  (ECF No. 46, ¶ 68.)  According to the Second Amended Complaint, Officer Lippe stopped Carter because the window tinting on Carter's vehicle

---

[1] As noted in this Court's May 30, 2023, Letter Order, three officers named as defendants in this matter remain unserved: Christopher Florio, Garey Dyer, and Steven McDonald.  (*See* ECF No. 77.) In their Motion, the Officer Defendants state: "the Parties conferred and hereby agree to proceed with this Court's consideration of this Motion, provided" that the unserved officers' "right to join the result of this Court's ruling on this Motion, as applied to them, is preserved."  (ECF No. 61-6 at 1 n.1.)

[2] This Memorandum Opinion concerns the claims that have not already been addressed by this Court. As noted in this Court's Letter Order of May 30, 2023 (ECF No. 76), this Court previously dismissed with prejudice Counts IV and VI (ECF No. 46, ¶¶ 107–16, 135–43) and determined that Counts V and VII (*id.* ¶¶ 117–34, 144–51) shall remain in this matter.  (*See* ECF No. 38.)  For the reasons set forth in the Court's Memorandum Opinion of March 22, 2022 (ECF No. 37), the Court reaffirms these conclusions.  (*See* ECF No. 76.)  In addition, pursuant to Federal Rule of Civil Procedure 21, and with the consent of all parties present at the May 30, 2023, hearing, the Court severed Count I of the Second Amended Complaint (ECF No. 46, ¶¶ 92–94).  (*See* ECF No. 77.)

[3] At the motion to dismiss stage, this Court "accept[s] as true all well-pleaded facts in [the] complaint and construe[s] them in the light most favorable to the plaintiff." *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017) (citing *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015)).

exceeded legal limits. (*Id.*) Officer Lippe informed another BPD officer and BPD dispatch that he believed Carter's vehicle resembled one for which the BPD was searching in connection with recent homicides. (*Id.*) Officer Lippe's supervising Lieutenant authorized him to conduct a search of the vehicle. (*Id.*) When Officer Lippe instructed Carter to exit the vehicle, Carter "immediately fled the scene at a high rate of speed." (*Id.* ¶ 69.) Officer Lippe and his backup officer "immediately ran to their cars and in a matter of seconds engaged in a vehicular pursuit of Carter northbound on Reisterstown Road." (*Id.*) Shortly thereafter, Carter began firing shots at Officer Lippe's vehicle. (*Id.* ¶ 70.) A BPD helicopter located and tracked Carter during the pursuit. (*Id.* ¶ 71.) The officers in the helicopter informed those on the ground "to exercise care" (*id.*), and later instructed them to pull back "if they didn't feel safe," and that the helicopter would "continue to follow Carter and note his location for apprehension" (*id.* ¶ 73). Plaintiff alleges that, at one point during the chase, "the officers got so close to Carter's vehicle that they made contact and caused his back bumper to fall off" (*id.* ¶ 72), and that helicopter dispatch instructed the pursuing officers to "keep their distance" (*id.* ¶ 73).

The chase, and ensuing gunfire, took place "down residential streets," while "passing schools" and "school busses on the road." (*Id.* ¶ 74.) Corbitt states that Carter and the officers chasing him "passed through upwards of thirty intersections, traveled down roads in the incorrect direction, [and] maintained speeds of over 90 miles per hour." (*Id.*) At one point, a BPD vehicle "lo[st] control and end[ed] up on a residential sidewalk to avoid colliding head on with a third-party car traveling lawfully down the narrow street." (*Id.* ¶ 73.) During the chase, at least one BPD officer fired three rounds at Carter from his moving vehicle. (*Id.* ¶ 75.)

According to the Second Amended Complaint, "Carter's vehicle eventually broke down from the duration and speed of the chase, gunfire, and being struck by a police vehicle at one point," and that Carter was apprehended at the 1800 block of Gwynns Falls Parkway. (ECF No. 46, ¶ 76.) By the time Carter was apprehended, Plaintiff alleges that there were more than nine police vehicles chasing him. (*Id.*)

Corbitt was "traveling as a passenger in a car driving down Wabash Road" when he was struck in the head by a stray bullet, and a second stray bullet narrowly missed him, during this chase. (*Id.* ¶ 77.) As a result of this incident, he has suffered "traumatic brain injury that caused at least one emergent brain surgery, grueling rehab, heavy medication, constant medical care, an ongoing debilitating seizure disorder controlled by [an] implant, constant pain, paralysis of limbs, and loss of autonomy and independence." (*Id.* ¶ 6.) Plaintiff alleges that "Carter would not have exchanged rampant gunfire with police if not provoked by the totally unnecessary and highly dangerous chase" (*id.* ¶ 80) and asserts that, based on the direction of the chase and projection of the bullet, the bullet that struck him "likely originated from one of the officers who fire from behind at the suspect" (*id.* ¶ 5). He also alleges that this incident occurred as a result of "BPD's policy, custom, and practice of vehicular pursuits" (*id.* ¶ 91) that "affirm a disturbing trend of death and/or serious bodily injury to innocent Baltimore citizens," particularly "in Black neighborhoods and to the Black residents of them" (*id.* ¶ 87).

According to the Second Amended Complaint, "BPD Policy 1503, effective September 13, 2017, was the controlling vehicular pursuit policy during" this incident. (*Id.* ¶ 36.) Plaintiff refers to the Baltimore Police Department Policy 1503, Emergency Vehicle Operation and Pursuit Policy ("Policy 1503"). Balt. Police Dep't, *Emergency Vehicle Operation and Pursuit Policy:*

*Policy 1503* (2017) [hereinafter, *Policy 1503*].[4]  The Second Amended Complaint explains that "Policy 1503 was first created in the wake of the Department of Justice Civil Rights Division's investigative report," released in August of 2016, which "studied BPD policing incidents between 2010–2015."  (ECF No. 46, ¶ 37.)  Plaintiff describes the content of this report as noting "that if a driver-suspect was shot while driving during a high-speed chase they could likely lose control of the vehicle and endanger the surrounding public" and that it "characterized shooting out of moving vehicles as force tactics that were 'highly dangerous' and 'ineffective' to stop fleeing suspect vehicles."  (*Id.* ¶ 41.)  The Second Amended Complaint alleges that this report cautioned against shooting at moving vehicles, "even when vehicles were charging officers."  (*Id.*)

Policy 1503 provides pertinent considerations for officers engaging in vehicular pursuits.  It authorizes officers to initiate a pursuit when "[t]he pursuit does not unreasonably endanger the safety of others when weighed against the risk the fleeing felon poses if not immediately apprehended but apprehended at a later time," *Policy 1503* at 3, and requires officers to terminate a pursuit "when the pursuing member believes that the danger to the member(s) or the public outweighs the necessity for immediate apprehension of the fleeing

---

[4] Policy 1503 was modified in November of 2019, after the events described in this case took place.  (*See* ECF No. 46, ¶ 43.)  The Court shall therefore reference the 2017 version of Policy 1503.  However, as this Court noted in its March 22, 2022, Memorandum Opinion: "The language of the policy permitting officers to use their firearms during high-speed chases was not altered during the revision process and reads the same in both the 2017 and 2019 versions."  (ECF No. 37 at 7.)

felon," *id.* at 4.[5]  It permits officers to fire weapons from a moving vehicle exclusively "to counter an imminent threat of death or serious physical injury to the member or another person, by a person in the vehicle using means other than the vehicle."  *Id.* at 6–7.  Further, Policy 1503 instructs officers to take certain factors into consideration before initiating or continuing a vehicular pursuit, including:

> 2.1. The safety of the public, including: the type of area, such as a school zone; time of day and lighting; weather, road conditions, and density of vehicular and pedestrian traffic; and the speed of the pursuit relative to these factors.
>
> 2.2. The pursuing members' familiarity with the area of the pursuit, the quality of radio communications between the pursuing vehicles and dispatchers/supervisors, and the driving capabilities of the pursuing member(s) under the conditions of the pursuit.
>
> 2.3. Whether or not the identity of the suspect has been verified.
>
> 2.4. The performance capabilities of the vehicles used in the pursuit in relation to the speed and other conditions of the pursuit.
>
> 2.5. Other persons in or on the eluding vehicle, such as passengers, suspects, and hostages.
>
> 2.6. The availability of other resources, such as air support assistance.
>
> 2.7. The likelihood of apprehension at a later time.

*Policy 1503* at 3–4.

---

[5] On a motion to dismiss, a court may take judicial notice of matters of public record.  *See Brennan v. Deluxe Corp.*, 361 F. Supp. 3d 494, 501 (4th Cir. 2019) (citing *Phillips v. Pitt Cty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)).  In addition, a court may consider information that constitutes "adjudicative facts" under Federal Rule of Evidence 201.  *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015).  Rule 201 permits a court to take judicial notice of these adjudicative facts only if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Fed. R. Ev. 201(b).  With this in mind, the Court takes judicial notice of the 2017 version of Policy 1503, which may be accessed at: https://www.baltimorepolice.org/sites/default/files/Policies/1503_Emergency_Vehicle_Operation _And_Pursuit_Policy.pdf.

On November 24, 2020, Plaintiff filed a six-count Complaint alleging various tort and constitutional claims against Defendants BPD, Davis, and Smith, as well as eighteen Officer-Defendants, BPD employees, and other individuals allegedly involved in the incident.  (ECF No. 1.)  Defendants Davis, Smith, and BPD filed a Motion to Dismiss for Failure to State a Claim.  (ECF No. 20.)  On August 10, 2021, this Court granted the Motion to Dismiss.  (ECF Nos. 25, 26.)  With respect to BPD and Defendants Davis and Smith in their official capacities, Counts I (negligence and gross negligence), III (negligent supervision), and VI (violations of the Maryland Declaration of Rights) were dismissed with prejudice.  (ECF No. 25 at 2.)  Additionally, with respect to BPD and Defendants Davis and Smith in their individual capacities, Counts I, III, V (deprivation of Fourth and Fourteenth Amendment rights, 42 U.S.C. § 1983), and VI were dismissed without prejudice.  (*Id.*)

On August 25, 2021, Plaintiff filed a seven-count First Amended Complaint, alleging claims under 42 U.S.C. § 1983 against Defendants BPD, Davis, and Smith, as well as fourteen Officer-Defendants and various other individuals allegedly involved in the incident.  (ECF No. 27.)  Defendants BPD, Davis, and Smith filed a Motion to Dismiss Plaintiff's Amended Complaint.  (ECF No. 30.)  On March 22, 2022, this Court granted in part and denied in part the Motion.  (ECF Nos. 37, 38.)  The Court dismissed with prejudice Counts IV (Fourteenth Amendment Violation—*Monell* Express Policy Liability) and VI (Fourteenth Amendment Violation—*Monell* Failure To Train Liability) as to BPD.  (*See* ECF No. 37.)[6]

---

[6] A *Monell* claim is one premised on the Supreme Court case *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978).  In *Monell*, the Supreme Court ruled that "[l]ocal governing bodies . . . can be sued directly under § 1983."  *Monell*, 436 U.S. at 690.

On August 9, 2022, Plaintiff filed the operative seven-count Second Amended Complaint, again alleging various tort and constitutional claims against Defendants BPD, Davis, Smith ("BPD Defendants"), nine named BPD officers ("Officer Defendants"), twenty "Doe Defendants," Carter, and Joseph Allen (the owner of the car in which Plaintiff was shot). (*See generally* ECF No. 46.)   The claims are as follows:  Bodily Injury by Negligent Operation of Automobile, against Insurance Company Defendants (Count I)[7]; Battery, against Carter and the Officer Defendants (Count II); Violation of the Fourteenth Amendment, 42 U.S.C. § 1983, against the Officer Defendants (Count III); Violation of the Fourteenth Amendment, 42 U.S.C. § 1983, *Monell* Express Policy Liability, against BPD (Count IV); Violation of the Fourteenth Amendment, 42 U.S.C. § 1983, Supervisory Liability, against Davis and Smith (Count V); Violation of the Fourteenth Amendment, 42 U.S.C. § 1983, *Monell* Failure to Train Liability, against BPD (Count VI); and Violation of the Fourteenth Amendment, 42 U.S.C. § 1983, *Monell* Condonation Liability, against BPD (Count VII).  (*See id.*)   On December 8, 2022, the Officer Defendants filed a Motion to Dismiss Counts I, II, and III of the Second Amended Complaint.  (ECF No. 61.)   On the same day, the BPD Defendants filed a Motion to Dismiss Counts IV, V, and VI of the Second Amended Complaint.  (ECF No. 62.)

## STANDARD OF REVIEW

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Rule 12(b)(6) of the Federal Rules of Civil

---

[7] The Second Amended Complaint does not clarify to whom Plaintiff refers as "Ins. Co. Defendants." (*See generally* ECF No. 46.)  Based upon arguments made during the May 30, 2023, hearing, the Court understands this claim as being asserted against Joseph Allen, the owner of the car in which Plaintiff was shot, in order to preserve a claim against the insurance policy on the car.

Procedure authorizes the dismissal of a complaint if it fails to state a claim upon which relief can be granted. The purpose of Rule 12(b)(6) is "to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). In ruling on a motion to dismiss, this Court "accept[s] as true all well-pleaded facts in a complaint and construe[s] them in the light most favorable to the plaintiff." *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017) (citing *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015)).

To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (quoting *Bell Atl., Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Under the plausibility standard, a complaint must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). A complaint need not include "detailed factual allegations." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). A complaint must, however, set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotations omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to plead a claim. *Iqbal*, 556 U.S. at 678; *see A Soc'y Without a Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011).

## ANALYSIS

The Officer Defendants and BPD Defendants have each moved to dismiss the Second Amended Complaint for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6).  (*See* ECF Nos. 61, 62.)[8]  This Court already addressed its findings as to Counts IV, V, VI, and VII in its previous Memorandum Opinion of March 22, 2022 (ECF No. 37), and its decision to sever Count I during the May 30, 2023, hearing and accompanying Letter Orders (*see* ECF Nos. 76, 77).   Accordingly, the present Memorandum Opinion concerns the arguments raised as to Counts II and III, and addresses Count V only as it relates to these arguments.

## I.    Officer Defendants' Motion to Dismiss (ECF No. 61)

The injuries in this case arise from a BPD vehicular chase of a criminal suspect, Mausean Carter, and the ensuing gunfire between BPD the officers and Carter.  (*See* ECF No. 46, ¶¶ 1–5.)  The Officer Defendants inform the Court that, for crimes committed prior to and during these events, Carter stood two trials on various murder and attempted murder charges.  (*See* ECF No. 61-6 at 11.)  The Officer Defendants' Motion hinges on its contention that the Court must take judicial notice of material contained in the records from the trials and subsequent appeal.  Specifically, the Officer Defendants urge this Court to take judicial notice of an unpublished opinion by the Maryland Court of Special Appeals, *Carter v. State*, No. 1360, Sept. Term, 2019, 2021 WL 2366881, at *1 (Md. Ct. Spec. App. June 9, 2021), *cert. denied*, 475 Md. 706, 257 A.3d 1165 (2021), *and cert. denied*, 211 L. Ed. 2d 511, 142 S. Ct. 825 (2022)

---

[8] Both of the pending Motions state that they "adopt and incorporate by reference" the arguments raised in the other motion.  (ECF No. 61-6 at 2 n.2; ECF No. 62-1 at 5 n.3.)

(unpublished), and the transcript of Carter's prosecution, which was "transcribed as part of the appeals process" and "is publicly available for a modest fee." (ECF No. 61-6 at 12.)  The Officer Defendants attached these documents to their Motion as Exhibits 2 and 3, respectively.  (*See* ECF Nos. 61-3 (unpublished opinion), 61-4 (transcript).)  The Officer Defendants insist that the Court consider, and take as true, the facts established in Carter's criminal proceedings, as well as statements made by Corbitt, Allen, and Officer Lippe in their testimony during Carter's trial.  (*See* ECF No. 61-6 at 13–19.)  The Officer Defendants argue that judicial notice of these statements "conclusively demonstrate[s]" that Plaintiff's claims are "abjectly false" because the "unequivocal record" dispels Plaintiff's theories of liability against the officers.  (*Id.* at 19–21.)

However, the Officer Defendants' characterization of judicial notice exceeds the limits set forth by Federal Rule of Evidence 201.  Rule 201(b) states that a court may take judicial notice of a fact "that is not subject to reasonable dispute," meaning that it: (1) "is generally known within the trial court's territorial jurisdiction" or (2) "can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned."  Fed. R. Ev. 201(b).  Pursuant to Rule 201(c), a court "must take judicial notice if a party requests it and the court is supplied with the necessary information."  Fed. R. Ev. 201(c).  Importantly, district courts caution that "[t]he consequences of a court taking judicial notice are significant." *Barnett v. United States*, No. 2:20-CV-02517-DCN, 2023 WL 142441, at *15 (D.S.C. Jan. 10, 2023); *Loftus v. F.D.I.C.*, 989 F. Supp. 2d 483, 490 (D.S.C. 2013).  As these courts have explained:

> Where the trial court has taken judicial notice of a fact in a civil matter, the judge must instruct the jury to accept that fact as conclusive. Fed.R.Evid. 201(g). A court taking judicial notice may also preclude the introduction of evidence to disprove the noticed fact. *See* Fed.R.Evid. 201(g) advisory committee note (discussing controversy surrounding whether evidence may be admitted to disprove facts judicially noticed). As stated in the Advisory Committee Notes to Rule 201, a "tradition of circumspection" surrounds judicial notice of adjudicative facts, and courts should exercise caution in taking judicial notice, doing so only when the matter is beyond reasonable controversy. Fed.R.Evid. 201(b) advisory committee note.

*Barnett*, 2023 WL 142441, at *15; *Loftus*, 989 F. Supp. 2d at 490.

Indeed, it is well established within the United States Court of Appeals for the Fourth Circuit that facts adjudicated in a prior case "'do not meet either test of indisputability contained in Rule 201(b).'" *United States v. Zayyad*, 741 F.3d 452, 463–64 (4th Cir. 2014) (quoting *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998)). Although the Court "may take judicial notice of the proceedings of another court," it may not "take judicial notice of another court's findings of fact for the truth asserted therein because such facts are usually disputed." *Hughes v. Freightliner, LLC*, No. 7:04CV00309, 2006 WL 1842997, at *1 (W.D. Va. June 29, 2006) (first citing *Taylor v. Charter Med. Corp.*, 162 F.3d 827, 830 (5th Cir. 1998); then citing *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) ("[A] court may take judicial notice of a document filed in another court 'not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.'")). Moreover, "[i]n taking judicial notice of records from prior judicial proceedings, 'generally, a court will recognize only indisputable court actions, such as the entry of a guilty plea or the dismissal of a civil action.'" *United States v. Daley*, 378 F. Supp. 3d 539, 546–47 (W.D. Va. 2019) (quoting *In re Omnicare Inc. Sec. Litig.*, 769 F.3d 455, 468 (6th

Cir. 2014), *aff'd sub nom. United States v. Miselis*, 972 F.3d 518 (4th Cir. 2020), *and aff'd sub nom.*
*United States v. Gillen*, No. 19-4553, 2022 WL 4395695 (4th Cir. Sept. 23, 2022)).

In sum, a court should not take judicial notice of "any specific factual finding, legal
reasoning, or legal conclusion" from another case, as it would be "inappropriate under Federal
Rule of Evidence 201(b)." *Id.* at 547; *see also Ferguson v. Extraco Mortg. Co.*, 264 F. App'x 351,
352 (5th Cir. 2007) ("A court may take judicial notice of a document filed in another court . . .
to establish the fact of such litigation and related filings, but generally cannot take notice of
the findings of fact from other proceedings because those facts are usually disputed and almost
always disputable."). Given the Fourth Circuit's clear rulings on this issue, and the "tradition
of circumspection" surrounding judicial notice, the Officer Defendants faced tough
headwinds in urging the Court to consider the truth of factual findings made by other courts.
Nothing in the briefing breaks through those headwinds. It would be improper for the Court
to take judicial notice of another court's findings of fact—the matter *sub judice* must be
adjudicated separately from Carter's criminal proceedings. Accordingly, the Court shall
address the Officer Defendants' challenges to Counts II and III of the Second Amended
Complaint, without consideration of the findings underlying Carter's criminal proceedings.

### A. *Plaintiff's Claim for Battery (Count II)*

As an initial matter, the Officer Defendants argue that Plaintiff's claim for battery must
be dismissed because "an affirmative defense exists for police officers" for claims of civil
battery, which dictates that "[a] police officer is not responsible if he or she inflicts an injury
unless the officer acts with malice toward that person." (ECF No. 61-6 at 25–26.) For this
proposition, the Officer Defendants cite to *Davis v. Muse*, 51 Md. App. 93, 96, 441 A.2d 1089,

1091 (1982).   However, the Officer Defendants provide no more information on this affirmative defense, its derivation, or how it may be applied in this case.   In *Davis*, the court found a reversible error where the trial court "refus[ed] to instruct that malice must be shown before a police officer may be held liable for assault and battery."   *Id.*   There, the court specifically pointed toward "Maryland governmental immunity" for public officials, *id.* at 98, but here, the Officer Defendants have neither named nor explained the doctrine they seek to invoke.   When asked about the immunity defense during the May 30, 2023, hearing, no further information or explanation was provided.   In the absence of any argument or explanation as to this affirmative defense, the Court cannot conclude that it applies.

Under Maryland state law, "the elements of the tort of battery consist of the unpermitted application of trauma by one person upon any part of the body of another person."   *Johnson v. Valu Food, Inc.*, 132 Md. App. 118, 123, 751 A.2d 19, 21 (2000) (citing *Saba v. Darling*, 72 Md. App. 487, 491, 531 A.2d 696 (1987), *aff'd*, 320 Md. 45, 575 A.2d 1240 (1990)). In the Second Amended Complaint, Plaintiff alleges: "On information and belief and based upon the fact that Plaintiff was struck from the rear, and that Carter was firing in the direction of the front of Plaintiff's head at the officers, the bullet that struck the Plaintiff likely originated from one of the officers who fired from behind at the suspect." (ECF No. 46, ¶ 5.)   Moreover, the Officer Defendants do not dispute that, during the vehicular pursuit, the pursuing officers exchanged gunfire with Carter and that Corbitt was struck in this crossfire.   Rather, they dispute the verity of Corbitt's claim that it was an officer's bullet that entered his skull, arguing instead that the bullet came from Carter's weapon.   (*See* ECF No. 61-6 at 25.)   This is not an issue to be resolved on a motion to dismiss.

14

At this juncture, it is of no great moment whether the bullet that struck Plaintiff was discharged from Carter's weapon or a police officer's weapon.  For the purpose of a motion to dismiss, the essential elements of battery have been met by virtue of Plaintiff's clear allegation that he was struck by a police officer's bullet, where the officer intended to fire the weapon during a high-speed chase in a densely populated area of Baltimore city.  Accordingly, the Officer Defendants' Motion is DENIED as to Count II of the Second Amended Complaint.

### B. Plaintiff's Claim for Violation of the Fourteenth Amendment, pursuant to 42 U.S.C. § 1983 (Count III)

Under 42 U.S.C. § 1983, a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.  *See* 42 U.S.C. § 1983.  To state a claim under § 1983, a plaintiff must allege that: (1) a right conferred by the Constitution or the laws of the United States was violated and (2) the alleged violation was committed by a person acting under the color of state law.  *See West v. Atkins*, 487 U.S. 42, 48 (1988).

The Supreme Court has explained that "the due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm."  *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 848 (1998).  Rather, "the cognizable level of executive abuse of power" for a Fourteenth Amendment violation under § 1983 is "that which shocks the conscience."  *Id.* at 847.  The *Lewis* Court explained that the "shocks the conscience" standard is met where conduct is "intended to injure" and is "unjustifiable by

any government interest." *Id.* at 848 (citing *Daniels v. Williams*, 474 U.S. 327, 331 (1986)).  The

Supreme Court aptly summarized:

> The issue in this case is whether a police officer violates the Fourteenth
> Amendment's guarantee of substantive due process by causing death through
> deliberate or reckless indifference to life in a high-speed automobile chase aimed
> at apprehending a suspected offender.  We answer no, and hold that in such
> circumstances only a purpose to cause harm unrelated to the legitimate object
> of arrest will satisfy the element of arbitrary conduct shocking to the conscience,
> necessary for a due process violation.

*Id.* at 836.  However, in a footnote, the Court stated that there may be a different result where

"a citizen suffers or is seriously threatened with physical injury due to a police officer's

intentional misuse of his vehicle."  *Id.* at 854 n.13.

This Court squarely addressed the "shocks the conscience" standard as to intentional

misuse of a police vehicle in *Simmons v. Baltimore City Police Department*, No. CV RDB-21-0969,

2021 WL 3418840 (D. Md. Aug. 5, 2021).  *Simmons* concerned a situation in which Baltimore

City police officers engaged in a car chase through the streets of the city, during which the

fleeing suspect struck another vehicle, killing the driver and seriously injuring the passenger.

*Id.* at *1.  There, this Court concluded that the plaintiff sufficiently alleged "the type of

conscience-shocking behavior that *Lewis* requires" for intentional misuse of a police vehicle.

*Id.* at *14.  The Court observed that, drawing all reasonable inferences in the plaintiff's favor,

"the Officer Defendants were intentionally misusing their vehicles by engaging in a pursuit

that was not necessary in its purpose nor in the manner that it was executed."  *Id.*  The Court

based this decision on the following facts:

> Plaintiffs allege that the Officer Defendants followed the Ford Fusion for
> eleven miles through Baltimore City, passing schools, a hospital, and numerous
> civilians and traveling through more than fifty intersections and down narrow
> residential streets at high speeds in excess of ninety miles per hour.  They allege

that throughout this chase, the GPS device, which had initially allowed the Officer Defendants to find the missing car, was active and available to provide the location of the eluding vehicle. They further allege that a helicopter flying overhead was also available to track the eluding vehicle's location. The Officer Defendants initiated this chase despite the fact that there was no evidence that the car had been carjacked—the owner had left the keys inside the vehicle. Unlike the allegations at issue in the Supreme Court's decision in *Lewis*, there are no allegations in this case that the eluding vehicle was already speeding through town when the Officer Defendants initiated the chase—[the fleeing suspect] was stopped and had been stopped for some time. The Officer Defendants also continued the chase without engaging in any de-escalation techniques and despite the perilous conditions of the route and the resources available to them to track the driver's location without the use of their police vehicles.

*Id.* (internal citations omitted).

The facts in the case at bar parallel those in *Simmons*. However, it is particularly notable that in this case, a police helicopter tracked Carter during the pursuit and officers were informed that it would "continue to follow Carter and note his location for apprehension" if the officers "didn't feel safe." (ECF No. 46, ¶ 73.) At the May 30, 2023, hearing, the Officer Defendants did not dispute that the BPD helicopter was monitoring Carter throughout the duration of the chase and that their decision to return gunfire during the high-speed pursuit was done with this knowledge. Although the Officer Defendants argue that their actions constituted a justifiable government action, and in fact were "commendably restricted under the circumstances" (ECF No. 61-6 at 6), the facts as alleged by Corbitt present a plausible claim that the officers' return of gunfire was unrelated to a legitimate law enforcement purpose.

This conclusion is bolstered by the considerations set forth in Policy 1503, the operative policy governing vehicular pursuits at the time of this incident. Notably, Policy 1503 beings with the statement: "The BPD recognizes it is better to allow a suspect to temporarily

17

escape apprehension than to jeopardize anyone's safety in a pursuit." *Policy 1503* at 1.  It also requires that officers consider certain factors "when deciding to initiate or continue a pursuit," including: "The safety of the public, including: the type of area, such as a school zone; time of day and lighting; weather, road conditions, and density of vehicular and pedestrian traffic; and the speed of the pursuit relative to these factors"; "Whether or not the identity of the suspect has been verified"; "The availability of other resources, such as air support assistance"; and "The likelihood of apprehension at a later time." *Id.* at 3.  In addition, Policy 1503 cautions that "[b]ecause intersections present a high risk of collisions, [law enforcement] members shall exercise due caution and slow down, as necessary, when proceeding through intersections, especially controlled intersections," and it prohibits law enforcement from pursuing "a vehicle driving the wrong direction on a roadway," requiring that they instead "maintain visual contact with the eluding vehicle by paralleling the vehicle while driving on the correct side of the roadway." *Id.* at 4.  As noted, Plaintiff alleges that this vehicle pursuit took place "down residential streets," while "passing schools" and "school busses on the road," through "upwards of thirty intersections," traveling "down roads in the incorrect direction," while maintaining "speeds of over 90 miles per hour."  (ECF No. 46, ¶ 74.)  Moreover, this chase was initiated without confirming that Carter was actually the suspect of the homicides for which he was ultimately convicted.  (*See id.* ¶¶ 68–70.)

Contrasting the guidance of Policy 1503 with the allegations in this case, and particularly the officers' return of gunfire under the circumstances alleged, the Court concludes that the "shocks the conscience" standard is amply met.  Count III of the Second Amended

Complaint sufficiently states a claim under 42 U.S.C. § 1983. Accordingly, the Officer Defendants' Motion is DENIED as to Count III.

## II.    BPD Defendants' Motion to Dismiss (ECF No. 62)

The crux of the BPD Defendants' Motion is that, should the Court dismiss the predicate constitutional violation claim raised in Count III, the claim for supervisory liability contained in Count V of the Second Amended Complaint must also be dismissed. (*See* ECF No. 62-1 at 7.) However, as discussed above, the Court has determined that the § 1983 claim in Count III survives the Officer Defendants' Motion. Moreover, for the same reasons as previously stated in the Court's Memorandum Opinion of March 22, 2022 (*see* ECF No. 37 at 20–28), the Court concludes that Plaintiff's Second Amended Complaint sufficiently states a claim for supervisory liability against Defendants Davis and Smith. (*See* ECF No. 76.) Accordingly, the BPD Defendants' Motion to Dismiss is DENIED as to Count V.

## CONCLUSION

For the reasons stated on the record on May 30, 2023, and explained above, the Officer Defendants' Motion to Dismiss (ECF No. 61) and the BPD Defendants' Motion to Dismiss (ECF No. 62) are DENIED. This Opinion is preceded by the Court's Order of May 30, 2023 (ECF No. 78).

Dated:        June 2, 2023                                _____/s/_____

                                                                        Richard D. Bennett
                                                                        United States District Judge

19