## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

TERRIL CORBETT,                          *

   Plaintiff,                           *

v.                                       *

                                                Civil No. 20-3431-BAH

BALTIMORE CITY POLICE                    *
DEPARTMENT ET AL.,
                                         *
   Defendants.
                                         *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM OPINION

Terril Corbett[1] ("Plaintiff" or "Corbett") was profoundly injured when he was shot on December 15, 2017 while riding in the back seat of a car on a routine trip to the hardware store. The shooting was senseless and apparently completely random, and it was the direct result of the actions of Defendant Mausean Carter ("Carter"), who at the time Corbett was shot, was leading police on a cross-town chase that left a trail of havoc and injury. During the pursuit, Carter drove recklessly and fired indiscriminately out the window of his car as he sought to elude accountability for a slew of serious offenses, including homicide. When Carter was finally pulled from his car and arrested, he had literally driven the tires off of his car and was in possession of two guns, one being an AK-47 style assault rifle.

As a result of the shooting, Corbett "suffered traumatic brain injury that caused at least one emergent brain surgery, grueling rehab, heavy medication, constant medical care, an ongoing

---

[1] Prior case captions have spelled Plaintiff's name as "Terrell Corbett," however the Third Amended Complaint corrected the spelling to "Terril Corbett." ECF 147-1, at 11 n.4. Plaintiff's last name on the docket is also erroneously spelled "Corbitt."

debilitating seizure disorder controlled by implant, constant pain, paralysis of limbs, and loss of autonomy and independence." ECF 119 (third amended complaint), at 2–3 ¶ 6. Corbett understandably seeks justice and compensation for the life-altering injuries he suffered in late 2017. He initially alleged that he was "struck either by a shot from Carter or by [the police officers who pursued Carter]." *Id.* at 21 ¶ 93. To that end, he brought suit against Baltimore Police Officers Phillip Lippe ("Lippe"), Eugene Coker ("Coker"), Cathal Luddy ("Luddy"), Bryant Jones ("B. Jones"), Lakisha Feaster ("Feaster"), Garey Dyer ("Dyer"), Aaron Jackson ("Jackson"), Jonathan Jones ("J. Jones"), Steven McDonnell ("McDonnell"), Christopher Florio ("Florio"), Roberto Arena ("Arena"),[2] Tyler Sentz ("Sentz") (collectively "Officer Defendants"), and Joseph Allen ("Allen"), alleging violations of Corbett's rights under the Constitution and state law. *Id.* at 21–30. He also sued Carter alleging battery. *Id.* at 21. Corbett also brought causes of action alleging supervisory liability against then-police Commissioner Kevin Davis ("Davis") and then-Chief T.J. Smith ("Smith"). *Id.* at 24–25. Finally, Corbett raises *Monell* claims against the Baltimore Police Department ("BPD") for allegedly failing to train officers and for condoning the unlawful use of force during emergency chases. *Id.* at 27–30. Corbett additionally raises a claim alleging "bodily injury by negligent operation of [an] automobile," which appears to allege negligent driving on the part of the Officer Defendants, and Corbett seeks indemnification from the "automobile insurance policy issued to [the driver of the vehicle Corbett was riding in when he was shot]." *Id.* at 20–21.

Pending before the Court is the Officer Defendants' Motion for Summary Judgment (the "Motion"). ECF 147. Plaintiff filed an opposition, ECF 154, and Officer Defendants filed a reply,

---

[2] Plaintiff's response reflects that his theory on summary judgment is that Officer Arena fired the shot that struck him. ECF 154, at 25.

ECF 162. All filings include memoranda of law and exhibits.[3] The Court has reviewed all relevant filings and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2025).

There is no debate that Corbett suffered horrific and life-changing injuries. The question before the Court is whether his claims alleging constitutional violations and battery at the hands of the police should proceed to trial. The Court finds that they should not. First, the Court finds that the theory that Corbett was shot by Officer Arena rests on "mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). As such, the Officer Defendants have shown that "there is no genuine dispute of material fact" as to the issue of who shot Corbett, and judgment as a matter of law is required on all counts that rest on the theory that Arena shot Corbett. *See* Fed. R. Civ. P. 56(a). Further, the record before the Court makes clear that even if Corbett had generated a dispute of material fact as to whether a police officer fired the shot that struck him, or that his injuries were attributable to the police pursuit of Carter, the relevant "shocks-the-conscience" standard demands more to establish a violation of the Constitution. In rendering this decision, the Court echoes the words of the Fourth Circuit in affirming that it does "not for one moment dismiss the pain of these events for those involved," particularly Corbett. *Belcher v. Oliver*, 898 F.2d 32, 36 (4th Cir. 1990). However, "their tragic character cannot be ameliorated by efforts to affix constitutional blame where it does not belong." *Id.* Accordingly, for these reasons and those stated below, Officer Defendants' Motion is **GRANTED**.

---

[3] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page, except for the physical exhibits. The Court cites physical exhibits by their exhibit number and time stamp. Due to an error attributed to the Court's filing system, Plaintiff re-filed a number of exhibits to the response in opposition to the pending motion at ECF 156. Plaintiff also provided a copy of a larger exhibit directly to chambers along with the body-worn camera footage. ECF 156, at 1.

Further, because there can be no supervisory or *Monell* liability without an underlying constitutional violation, Plaintiff is **ORDERED** to **SHOW CAUSE**, within fourteen days, as to why the remaining claims against the BPD, Smith, and Davis should not be dismissed. Plaintiff is also **ORDERED** to **SHOW CAUSE** within fourteen days as to why count one, alleging "bodily injury by negligent operation of [an] automobile" should not be dismissed.

## I.    BACKGROUND

The relevant events began on December 15, 2017, when Lippe pulled over Carter because Carter's window tint was too dark. ECF 147-2 (Lippe's Incident Report), at 2. The Incident Report reflects that the car Carter was driving "matched the description of a [be on the look-out] for a vehicle that was wanted in connection to multiple shootings in Baltimore City." *Id.*; ECF 147-3 (Lippe Dep.), at 33, 32:8–22. After Lippe asked Carter to step out of his vehicle, Carter fled the traffic stop at 11:18 AM EST.[4] Exhibit 4 (Lippe Body Worn Camera Footage[5]), at 16:18:58. Officers Lippe and Jackson initiated a vehicle pursuit with emergency lights and sirens activated. *Id.* at 16:19:06. Plaintiff concedes that "Lippe's conduct in initiating the chase is not at issue." ECF 154, at 22.

Within forty seconds of the chase starting, Carter began discharging his weapon out of his car window. Ex. 4, at 16:19:20–44; ECF 147-3, at 36, 35:19–22. Lippe testified that "[t]he initial discharging was out the right side of his vehicle a few seconds after the pursuit started," and "[t]he

---

[4] "[T]he timestamp in the upper right-hand corner of the body worn camera footage in this matter is what is known as 'Zulu time' which is approximately five hours ahead of the actual time (*i.e.*, 16:10 signifies 11:10)." ECF 147-1, at 9 n.1 (citation omitted). The Court will use EST when discussing the timing of events in the body of the opinion, but the Court will use Zulu time for citations so that the citations match the timestamps in the footage.

[5] Both parties submitted Officer Lippe's body worn camera footage as a physical exhibit. Defendants' footage, Exhibit 4, captures only 21 minutes of the chase, while Plaintiff's footage, also titled Exhibit 4, captures the entire pursuit. Therefore, the Court cites to Plaintiff's footage.

window of [Carter's] passenger side front door was shattered, and people actually started ducking on the right side on the sidewalk." ECF 147-3, at 82, 81:1–5. Lippe informed dispatch of his location and requested the involvement of Foxtrot, BPD's helicopter. Ex. 4, at 16:19:12–17. At 11:19 AM, gunshots can be heard on Lippe's body-worn camera footage and Lippe stated over the radio: "be advised he may be firing a weapon out of the window." *Id.* at 16:19:38–41. Around fifteen seconds later, additional gunshots can be heard, and Lippe stated over the radio, "10-4, he has a firearm, he is firing out, he is firing out right now." *Id.* at 16:19:56–58. Lippe then continued to inform dispatch of the location of the pursuit as it progressed and stated that Carter was "armed and dangerous." *Id.* at 16:20:03–35.

The chase led Carter past homes, businesses, restaurants, churches, schools, and the campus of Coppin State University. ECF 147-22 (Defs. Ballistics Expert Report), at 9. Lippe testified that he believed Carter was "creating a threat of imminent bodily injury to the citizens of Baltimore City" by firing his gun out of his vehicle. ECF 147-3, at 40, 39:1–5. When asked about his plan for the pursuit, Lippe testified: "My plan at that time was to pursue [] Carter until we were able to stop him from firing his [] weapons and/or get him into custody." *Id.* at 55, 54:7–13. Lippe could not recall any training he had received on how to terminate emergency pursuits. *Id.* at 29, 28:7–19.

Officer Arena, who was riding in an allegedly unmarked vehicle, ECF 154, at 5, driven by Officer Sentz, testified that the officers "responded to assist" at 11:20 AM, four minutes before Plaintiff was struck. ECF 147-6, at 57, 56:5–12. Sentz testified that he "never got on to the radio" to request to join in the pursuit. ECF 147-10 (Sentz Dep.), at 88, 87:7–17. According to the BPD's Emergency Vehicle Operation and Pursuit Policy, "[m]embers not involved in the pursuit . . . shall not become involved with the pursuit unless directed otherwise by a supervisor." ECF 147-29, at

9. Additionally, driving in "Emergency Response Mode" is only permitted under BPD policy when "law enforcement vehicles [are] equipped with emergency lights and siren." *Id.* at 3 ¶ 1. Arena testified that his vehicle "did have lights on."[6]  ECF 147-6, at 99, 98:4–9.

It is undisputed that Plaintiff was shot at 11:24 AM at the intersection of Wabash Avenue and Rogers Avenue. *See* ECF 154, at 8; ECF 162, at 16. As Lippe passed by the intersection of Wabash and Rogers where Plaintiff was shot, his camera is covered. Ex. 4, at 16:24:12–22. About ten seconds later, Lippe reported over the radio that Carter "keeps firing out of his vehicle at passing vehicles." *Id.* at 16:24:22–26. Around thirty seconds later, Lippe's supervisor advised him to "just keep [Carter] in sight, let Fox[trot] get there; do not let him get a shot at you; just keep him in sight." Ex. 4, at 16:24:52–58. In response, Lippe said: "10-4 Lt., don't let him shoot at me, copy that." *Id.* at 16:25:04-10. Foxtrot gained visibility on Carter's vehicle at 11:27 AM. *See* Ex. 8 (Foxtrot Video), at 03:58–4:05.

The parties contest who shot Plaintiff. Plaintiff argues that Arena shot Plaintiff at the intersection of Wabash and Rogers while firing his weapon at Carter and includes citations to a ballistics report, deposition testimony by the driver of the car Plaintiff was riding in, and deposition testimony from Lippe, Arena, and Sentz. ECF 154, at 8–9. Defendants maintain that "Plaintiff asserts a theory based on pure speculation that [] Arena fired the bullet(s) that struck him," and that "[l]ooking at the evidence, this position is untenable." ECF 162, at 7. In his deposition, Lippe testified that he did not recall seeing Carter aim his firearm at the car in which Plaintiff was a passenger. ECF 147-3, at 48, 47:7–14. While Arena denies being present at the intersection at the time Plaintiff was shot, he testified that he believes it would have taken him "a couple minutes" to

---

[6] Plaintiff states that "Arena and Sentz joined the pursuit with their internal emergency lights on," ECF 154, at 5, but the evidence cited for this statement does not address *internal* lights. Arena testified, "Yes, we did have lights on." ECF 147-6, at 99, 98:4–9.

6

get from Wabash and Rogers, where Plaintiff was shot at 11:24 AM, to Cold Spring and Reisterstown Road, where Arena turns on his body-worn camera at 11:27:23 AM. ECF 147-6, at 65, 64:8–21. In support of his allegation that Arena shot Plaintiff, Plaintiff contends that Arena's camera was not turned on at the time of the shooting, Arena "failed to report the fact that he had unholstered his firearm or submit it for inspection pursuant to the investigation of an officer-involved shooting," and "[n]either Arena nor Sentz appears anywhere in any investigation of a suspected officer-involved shooting, despite the fact that all other 'involved' officers were investigated and had their firearms subjected to a magazine count."[7] ECF 154, at 9–10.

For the sake of clarity, the Court notes that it is undisputed that the following events took place *after* Plaintiff was shot. According to Plaintiff, "Officers Arena and Sentz did not turn on their body-worn cameras for the first seven minutes of their participation in the pursuit despite being required to do so by BPD policy." ECF 154, at 6 (citations omitted). Once the cameras were turned on, which indisputably was *after* Plaintiff was shot at 11:24 AM, Sentz can be heard saying to Arena as their vehicle travels down West Cold Spring Lane toward Wabash Avenue and they apparently see Carter's vehicle in the distance, Ex. D, at 16:27:27, "get ready with your gun," *id.* at 16:27:47. Then, the footage shows what appears to be part of Arena's unholstered firearm. *Id.* at 16:27:47–53. Arena testified that Sentz told him to "get out of the car," or "get ready to get out of the car." ECF 147-6, at 89, 88:11–18. Sentz testified that Carter was "going to hit traffic and not have the option to go any more with his vehicle and that he was going to bail out and be ready in case he fired upon us with the rifle." ECF 147-10, at 140, 139:17–25. When asked if Sentz "instructed [] Arena to be prepared to fire upon a suspect that [he had] not seen with a

---

[7] The Court notes that it is undisputed that Officer Bryant Jones—who Plaintiff agreed to dismiss from the case—shot at Carter three times at 11:44 AM, roughly twenty minutes after Corbett was shot. ECF 147-13, at 7.

weapon yet," Sentz responded: "I was operating off of the belief that through the officer's observations on the radio that he was fired upon, that the suspect was armed. I had to take the word from the officer on the radio." *Id.* at 141, 140:12–20. Sentz affirmed that he said, "get ready" and "don't give him a chance." *Id.* at 144, 143:12–19. Arena testified that he was "prepared to match force with force . . . [i]f the suspect was attempting to use deadly force to me or my officers, I was ready to use that force back to stop him from hurting more people." ECF 147-6, at 97, 96:8–12.

Sentz testified that approximately "five to seven" police vehicles were pursuing Carter. ECF 147-10, at 105, 104:2–4. According to Plaintiff, "[n]o authorization had been given for additional units beyond Lippe and Jackson to enter the pursuit as required under the BPD's emergency pursuit policy." ECF 154, at 6 (citing ECF 147-29, at 9). Sentz confirmed that "there was no invitation" to join the pursuit. ECF 147-10, at 119, 118:16–18.

Arena testified that they went through red lights "after we cleared [the] intersection." ECF 147-6, at 83, 82:6–19. Sentz similarly indicated that "[t]here were several intersections that [they] went through safely with [the] lights and sirens." ECF 147-10, at 99, 98:19–20. Sentz testified that it was "possible" that he was speeding, cutting off cars in traffic, and going down a street the wrong direction but that he cannot say for sure because he was "making sure that [he] was safely operating a vehicle and not striking anybody." ECF 147-10, at 100–101, 99:2–100:5. Sentz also indicated that he was "merely following the communication from Foxtrot and the additional units that were in front of [him] during this pursuit." *Id.* at 101, 100:7–9.

Sentz acknowledged that at one point, a supervisor instructed all of the units chasing the car to "back off," but Sentz testified that he had already "backed off of the vehicle. I wasn't right on its bumper. I wasn't even the lead car in that incident." ECF 147-10, at 113, 112:18–22. Sentz

acknowledged that "[i]n reviewing the tape, [he] heard the voice from somebody" saying "the speed is getting out of control," *id.* at 120, 119:2–5, but he "[couldn't] remember" whether he adjusted or decreased his speed in response to that command, *id.* at 119, 118:19–23. At some point, Sentz responded to a request to back off by saying "back off my fucking ass." *Id.* at 146, 145:9–20. Sentz also recalled seeing Carter "[get] pretty close to other vehicles," when asked whether Carter almost ran into multiple cars. *Id.* at 125, 124:16–19.

Carter was apprehended at 12:02 PM at the intersection of Gwynn Falls Avenue and Reisterstown Road. ECF 147-10, at 127, 126:6–14; ECF 147-11, at 19. Immediately after the pursuit ended, Lippe shouted, "This one's mine!" and celebrated the apprehension of Carter with Officer Jackson, all of which was captured on Lippe's bodycam. Ex. 4, at 17:04:00–44. When Lippe commented, "This one belongs to me!" his supervisor responded, "I know." *Id.* at 17:04:00–05. During an interview with Carter after the pursuit ended, a BPD detective told Carter he had been "about to get some hot rounds on [his] ass." ECF 147-18, at 228, 227:10–11. Eventually, Lippe received a Bronze Star and commendation for the pursuit. ECF 147-3, at 60, 59:7–20.

According to Geronimo Rodriguez, Plaintiff's expert, "[i]t's the primary officer's responsibility to call off the pursuit." ECF 147-8 (Rodriguez Dep.), at 227, 225:21–22. Rodriguez also testified that "[t]his was a very unique situation that presented a great risk to the—not only the motoring public, to the officers, and pedestrians." *Id.* at 144, 142:2–4. According to Rodriguez, the "appropriate thing was to back off to make sure that the rounds wouldn't kill someone." *Id.* at 138, 136:10–12. Rodriguez followed up by stating that: "[s]ometimes we use that tactic when there isn't a weapon involved because hopefully, if they don't see the black and whites pursuing them, they slow down thus preserving the safety of the motorists and pedestrians on the street." *Id.* at 138, 136:12–17. Rodriguez indicated that "the benefit would have been not

staying close, which a lot of people were telling Lippe to do that because of the potential of getting injured." *Id.* 136:18–21. Rodriguez also testified that he does not believe it is a "generally accepted practice . . . to have an unknown number of units all around the pursuit, paralleling the pursuit, in the pursuit, violating the overhead, being in a marked black and white unit, and cutting each other off." *Id.* at 167, 165:13–19. In Rodriguez's opinion, "[y]ou need to be able to articulate why you need additional units. And you have to constantly weigh that with the potential impact to . . . a congested city like Baltimore." *Id.* at 207, 205:10–14. Rodriguez also believes there was no "supervisory oversight," which was represented by officers "self-deploying into the pursuit." *Id.* at 213, 211:15–21. According to Rodriguez, this creates greater risk for civilians because vehicles "coming in and out of the pursuit path" creates a "greater propensity for a traffic collision, whether for the motor[ist] in public, the pedestrians, that's the concern that I mentioned, which carried all the way through." *Id.* at 143, 141:4–9. Ultimately, Rodriguez disagreed that "taking in combination and based on the totality of the facts [and] circumstances, a reasonable officer would conclude that the need to capture Carter outweighed the dangerousness of the pursuit." *Id.* at 214, 212:11–14. Rodriguez also believes that BPD officers have "entrenched styles that sometimes don't comport [with] the best practices." *Id.* at 141, 139:1–2. Finally, Rodriguez concluded that, in his opinion, this pursuit "present[ed] a greater risk to the community than we're willing to take." *Id.* at 143, 141:17–19.

## II.    **LEGAL STANDARD**

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether

10

it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

"Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine factual dispute exists." *Progressive Am. Ins. Co. v. Jireh House, Inc.*, 608 F. Supp. 3d 369, 373 (E.D. Va. 2022) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986)). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477 U.S. at 247–48 (emphasis in original).

The Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor, *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam); *Scott v. Harris*, 550 U.S. 372, 378 (2007), and the Court "may not make credibility determinations or weigh the evidence," *Progressive Am. Ins. Co.*, 608 F. Supp. 3d at 373 (citing *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007)). For this reason, summary judgment ordinarily is inappropriate when there is conflicting evidence because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002).

At the same time, the Court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir.

2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 2003)). "The existence of a mere scintilla of evidence in support of the nonmoving party as well as conclusory allegations or denials, without more, are insufficient to withstand a summary judgment motion." *Progressive Am. Ins. Co.*, 608 F. Supp. 3d at 373 (citing *Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020)).

## III.    ANALYSIS

As an initial matter, Plaintiff concedes that he does not seek to hold Dyer, Florio, McDonnell, Coker, Feaster, B. Jones, or J. Jones liable for Plaintiff's injuries. ECF 154, at 2 n.1. Plaintiff explains that "[t]hese individuals were named by [d]efense counsel originally as being involved in the pursuit, but subsequent discovery revealed that they were not involved in a way that could be attributed to Plaintiff's injuries." *Id.* Therefore, the Court dismisses these Defendants from the case.[8]

Plaintiff contends that "there is a genuine dispute as to who shot Corbett." ECF 154, at 24. Defendants argue that "[w]hile both Officers Sentz and Arena did have their firearms unholstered at some point, they each stated, under oath, that they did not discharge their firearms during the pursuit of Defendant Carter." ECF 147-1, at 24 (citing ECF 147-10, at 25, 24:10–17; *id.* at 30, 29:21; ECF 147-6, at 23, 22:7–11; *id.* at 54, 53:17). Plaintiff maintains that "a review of the evidence suggests that it is highly unlikely that Carter shot [Plaintiff], and more likely than not that he was shot by Officer Arena." ECF 154, at 24. The Court finds that the theory that Corbett was shot by Officer Arena rests on "mere speculation or the building of one inference upon

---

[8] Luddy was omitted from Plaintiff's list of officers he does not seek to hold liable, but Defendants "believe this was done [] in error," because "[i]t is evident in the Opposition that Plaintiff is proceeding on claims only as to Officer Defendants Philip Lippe, Aaron Jackson, Tyler Sentz, and Roberto Arena" and "the name 'Cathal Luddy' appears nowhere in the Opposition." ECF 162, at 4 n.1. Because the Court grants summary judgment in favor of the remaining Officer Defendants, the Court need not decide whether Luddy was erroneously omitted.

another." *Beale*, 769 F.2d at 214. However, even if the Court were to assume that Arena shot Plaintiff, the record evidence still does not establish conduct that shocks the conscience.

### A.    There is No Genuine Dispute of Fact Over Who Shot Plaintiff.

Officer Defendants have shown that there is no genuine dispute as to any material fact and thus they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A review of the proper procedure at the summary judgment stage is in order. By rule, "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

*Id.* at (c)(1). However, "[g]enuine issues of material fact cannot be based on mere speculation or the building of one inference upon another." *Barwick v. Celotex Corp.*, 736 F.2d 946, 963 (4th Cir. 1984). While "it is the province of the jury to resolve conflicting inferences from circumstantial evidence . . . [p]ermissible inferences must still be within the range of reasonable probability." *Ford Motor Co. v. McDavid*, 259 F.2d 261, 266 (4th Cir. 1958), *cert. denied*, 358 U.S. 908 (1958). The Court has a "duty" to "withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." *Id.* As the Supreme Court cautioned when discussing when a civil case should go to a jury, "[w]hatever may be the general formulation, the essential requirement is that mere speculation be not allowed to do duty for probative facts, after making due allowance for all reasonably possible inferences favoring the party whose case is attacked." *Galloway v. United States*, 319 U.S. 372, 395 (1943).

The Court is, of course, mindful that genuine disputes of fact must be submitted to a jury, a body to whom our nation's founders entrusted with this paramount role. However, as the Court of Appeals for the Third Circuit noted:

> The jury's role in our legal tradition probably represents modern America's unique characteristic in the trial of civil cases. Its role cannot be minimized, nor its importance dissipated one iota. Yet the limits of the jury's role must always be recognized. The jury translates as found fact a congeries of relevant evidence on controverted factual issues. The jury does not engage in the final stage of this process until the court makes the critical legal decision that there is sufficient evidence to submit to the jury for the purpose of resolving conflicts in the evidence or inferences permissibly drawn from the evidence, or both. In removing a case from the jury, the court undertakes the vital task of "protecting neutral principles of law from powerful forces outside the scope of the law—compassion and prejudice."

*Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 116 (3d Cir. 1980) (quoting *Rutherford v. Ill. Central R.R.*, 278 F.2d 310, 312 (5th Cir.)). Indeed, "[t]he court's role is especially crucial when, as here, the plaintiff's case, and therefore the defendant's liability, is based solely on circumstantial evidence." *Id.*

Here, Officer Defendants assert that there is no evidence that any Officer Defendant discharged their firearm and thus no genuine dispute of fact that the bullet that struck Corbett was not fired from a BPD officer's gun. ECF 147-1, at 24. In support, Officer Defendants note that "[n]o document or testimony produced during discovery supports the claim that either Officer Sentz or Officer Arena discharged their firearm on December 15, 2017." *Id.* (citations omitted). "Moreover," they argue, "the windows of the police car operated by Officers Sentz and Arena remained intact after the pursuit of Defendant Carter; they were not broken, as would be expected if someone inside the vehicle had discharged a firearm." *Id.* at 25. As to the undisputed fact that "Officers Sentz and Arena's firearms were not inspected," Officer Defendants note that this was a decision made by police personnel other than Sentz and Arena, and thus not the fault of Sentz or Arena. *Id.* Plus, they note that there is "no evidence that Officers Sentz and Arena were ever

present at the 5400 block of Wabash Avenue at 11:24AM when Plaintiff was injured, or any other time on December 15, 2017." *Id.* Finally, though it is undisputed that Sentz and Arena did not activate their body-worn cameras until 11:27 AM, *id.* at 26, this was because "they were merely attempting to locate the pursuit and were not actively involved until they observed [] Carter's vehicle." *Id.*

Further, Officer Defendants point to ample evidence that it was Carter who fired the shot that struck Corbett. As his body-worn camera footage makes clear, Lippe repeatedly notes during the pursuit, in real time, that Carter "has a rifle in the vehicle [with] multiple discharges out of the vehicle." Ex. 4, at 16:23:21. The footage then captures the distinct sound of two shots being fired at the precise location where Corbett was struck, *id.* at 16:24:11, after which Lippe exclaims that Carter "keeps firing out of his vehicle at passing vehicles," *id.* at 16:24:22. Officer Defendants also note that at Carter's criminal trial, Joseph Allen, the driver of the car Plaintiff was shot in, testified that as he sat at the intersection of Wabash Avenue and Rogers Avenue, he heard police sirens and saw "the window rolled down in this car," "this guy's hand coming out of the window," and told "everybody in the car to duck," after which he heard "a loud explosion" and then saw that Corbett "had a big gash in his head" and "wasn't responding." ECF 147-18 (Allen Testimony), at 53, 52:13–17, 22–25. Allen later clarified that it was a "silver or gray colored car" he saw and that he saw "a hand out – coming out the – towards the window, and then [he saw] something, [and] told everybody to duck." *Id.* at 56, 55:7–13. Finally, Officer Defendants note that when asked to admit that he shot Corbett, Carter invoked the Fifth Amendment. ECF 147-1, at 28 (citing ECF 147-28, at 5 (Requests for Admission)).

Plaintiff responds that Arena and Sentz failed to turn on their body-worn cameras when they entered the pursuit and argues that a "jury is empowered to infer that Arena did not want the

first seven minutes of his participation in the pursuit to be captured." ECF 154, at 21. He notes that Arena's weapon was not checked and argues that an adverse inference can be inferred "that Arena and Sentz knew that submitting this evidence would be unfavorable for them[.]" *Id.* at 26.

As to the argument that Carter shot Corbett, Plaintiff counters that "[b]oth parties have disclosed ballistics experts who believe that the bullet that struck Plaintiff was fired from the front of the car Plaintiff was riding in." *Id.* at 24. Plaintiff notes that since the rear window of Carter's car was intact when the car was eventually stopped, he could have only fired the shots "out of the front two windows of his car." *Id.* at 25. Thus, "[t]he only way Carter would have been able to fire from the front of [the driver's] vehicle would have been if [Carter] fired while he was performing the right-hand turn around the car from the left-most lane on Wabash Ave." *Id.* "This," Plaintiff alleges, "would require Carter [to] carry and aim his rifle with one hand, making a turn at a high-rate of speed, while still shooting out of his front passenger window." *Id.*

Plaintiff also argues that the driver of the car he was shot in "had no recollection" of seeing Carter shoot at his car and was "more focused on his own self-preservation and so did not notice where Carter was when the bullets were fired." *Id.* at 24–25 (citing ECF 147-12, at 64, 65:17–22). Plaintiff further claims that the driver "acknowledged that his account was based on assumptions rather than direct observation." *Id.* at 25 (citing ECF 147-12, at 65, 64:14–17[9]).

In reply, Officer Defendants summarize the number of undisputed factual issues:

- "Defendant Carter discharged at least one firearm multiple times while evading the police on December 15, 2017." ECF 162, at 6 (citing ECF 154, at 4).

- "Defendant Carter was on the 5400 block of Wabash Avenue at 11:24AM when Plaintiff was injured." *Id.* (citing ECF 154, at 8).

---

[9] The Court notes that the cited testimony is: "Q: At what point did you duck? A: Once the flash and the explosion, because I tried – I figured somebody was shooting, because I done heard gunshots before. So I was telling everybody to duck." ECF 147-12, at 65, 64:14–17.

- "[A]t 11:24AM, two gunshots can be heard ringing out on Officer Lippe's body worn camera ("BWC") then shortly thereafter Officer Lippe reports to dispatch that Defendant Carter 'keeps firing out of his vehicle at passing vehicles.'" *Id.* (citing Ex. 4, at 16:27–16:44).

- "Officer Lippe did not see any police vehicles, other than Officer Jackson's, prior to 11:26AM." *Id.* (citing Ex. 4, at 18:19–18:55; Ex. 2, at 88:15–16).

- "Defendant Carter was already tried and convicted for the attempted first-degree murder of Plaintiff stemming from the instant pursuit." *Id.* (citing ECF 147-26, at 56).

- "[T]hat Defendant Carter invoked his Fifth Amendment right to protect against self-incrimination when asked if he shot Plaintiff on December 15, 2017." *Id.* (citing ECF 147-27, at 31).

Officer Defendants also state that "[i]t is undisputed that the expert witnesses assert the bullet that struck Plaintiff originated from the left (or driver's) side of the vehicle that Plaintiff was occupying . . . ." ECF 162, at 7 (citing ECF 147-22, at 14; ECF 156-5, at 37).

The Court notes that Plaintiff's summary of key facts is inaccurate in several critical respects. First, describing both expert reports as endorsing the idea that "the bullet that struck Plaintiff was fired from the front of the car Plaintiff was riding in" is not completely accurate. ECF 154, at 8. In fact, Plaintiff's own expert affirms the following:

> Mr. Corbett was seated in the back seat, passenger side of the Chevy Impala which was stopped for a traffic light at the intersection of Wabash Avenue and N Rogers Avenue. The bullet that struck the vehicle *was discharged at a rearward angle and originated from the driver's side of the vehicle*. The bullet entered the driver's side rear window, continued at a rearward angle and struck Mr. Corbett in the head and then exited the vehicle through a small rear window on the passenger's side.

ECF 156-5, at 37 (emphasis added). Officer Defendants' expert agrees that "the shot(s) fired in association with Mr. Corbett's gunshot-related wounds . . . are consistent with a shot fired from the Chevy Impala's left rear side toward the right rear back of the vehicle." ECF 147-22, at 14. As such, all expert testimony related to the trajectory of the shot (or shots) that struck Corbett are

consistent in finding that the bullet was fired from the left side of Corbett's vehicle, not "from the front," ECF 154, at 8, as Plaintiff alleges.

Further, Plaintiff's description of deposition testimony by Joseph Allen, the driver of the car in which Corbett was shot, is also inaccurate. First, Allen admitted that he saw Carter holding a weapon as he drove past the Chevy Impala, describing it as "more of a revolver." ECF 147-12, at 49, 48:13, at 50–51, 49–50:20–3. Far from struggling to recall the events related to Corbett's shooting, Allen testified at his deposition that Carter "pointed the gun out the window or put it towards the window or out the window and fired the shot on his way back." *Id.* at 51, 50:1–3. When asked to clarify the sequence of events, Allen stated that "[Carter's] hand was close enough that I could see because, like I said, the front of his car was near that mirror, that driver's side mirror; the front of his car was there when he fired the shot." *Id.* at 52, 51:12–17. Ultimately, Allen clarified that upon seeing a "flash" and hearing "an explosion," he "figured somebody was shooting because [he had] heard gunshots before," and told "everybody to duck." *Id.* at 65, 64:15–17. It is flatly incorrect to assert that the driver "testified at his deposition that he actually had no recollection of this particular course of events." ECF 154, at 9.

Ultimately, Officer Defendants have "cit[ed] to particular parts of materials in the record" "showing that the materials cited do not establish the . . . presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A) and (B). "[O]nce the movant has satisfied this 'initial burden' of demonstrating the absence of a genuine dispute as to any material fact, the nonmoving party must show that a genuine dispute does, in fact, exist." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013) (citing *Bouchat*, 346 F.3d at 522). This, Plaintiff has not done. Instead, Plaintiff impermissibly relies on "conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Id.* (citations omitted). Plaintiff offers a theory that

18

Arena fired the shot that injured him, but points to no evidence in the record substantiating that claim beyond raising the prospect that had police checked Arena's weapon, they would have discovered that it had, in fact, been discharged. This amounts to mere speculation. The claim that Sentz and Arena were actually present when Corbett was shot is also speculative and supported only by the allegation that body-worn camera footage would have confirmed this allegation had the camera been activated. Beyond these allegations, Plaintiff essentially resorts to generously interpreting expert reports and mischaracterizing eyewitness testimony to bolster the argument that the bullet that tragically struck him came from anywhere other than where the record evidence establishes it did, namely from a weapon fired by Carter. In short, Plaintiff's argument that the bullet came from a gun fired by Arena is based solely on the "building of one inference upon another" or, at best, "the mere existence of a scintilla of evidence." *Dash*, 731 F.3d at 303. As such, Officer Defendants are entitled to summary judgment on both the battery claim and § 1983 claim because there is no genuine dispute over who shot Plaintiff.

The case of *Swann v. City of Richmond* is instructive on this point. 498 F. Supp. 2d 847 (E.D. Va 2007). There, the plaintiff filed suit against the city of Richmond, Virginia and several of its police officers alleging constitutional violations stemming from an encounter that ended with a police officer, Hathaway, firing shots, one of which plaintiff contended had struck him in the leg. *Id.* at 852. Hathaway contended that "he did not shoot [plaintiff]," and thus did not violate the plaintiff's rights. *Id.* at 859. Faced with a motion by Hathaway seeking summary judgment, the trial court concluded that "[t]he record supports Hathaway's position because there is no evidence in the record from which a jury reasonable could conclude, by a preponderance of the evidence, that Hathaway shot [plaintiff]." *Id.* at 859. Noting that it was undisputed that two of three shots did not strike plaintiff, the court observed that "there is no evidence from which a

reasonable jury could find, by a preponderance of the evidence, that the third bullet hit [plaintiff]."
*Id.* Since plaintiff could only "speculate about the third bullet and whether it hit him," the court
agreed that summary judgement was in order because "the party who bears the burden of proof on
an issue at trial can survive summary judgment only if he has sufficient evidence from which a
reasonable jury could [find] for hi[m], by a preponderance of the evidence, on that point." *Id.*
(citing *Celotex*, 477 U.S. at 327).

Here, as established above, Corbett was shot as he sat in the back seat of the Chevy Impala.
Experts and witnesses agree that the bullet that struck him was fired from the left side of the
Impala. The driver of the car Corbett sat in saw Carter holding a gun as Carter drove by the Impala,
saw a flash, and heard a sound consistent with a gunshot. Body-worn camera footage supports
that two shots were fired at the precise time the Impala was at the intersection where Corbett was
struck, and an eyewitness noted that at the time Corbett was shot, Carter was shooting randomly
at vehicles, a fact corroborated by the trail of destruction left in Carter's wake. Carter was later
arrested and found to be in possession of several firearms. No evidence suggests that Arena was
the shooter beyond mere speculation. Thus, as in *Swann*, Plaintiff has failed to show "he has
sufficient evidence from which a reasonable jury could find for him . . . on that point." *Id.*
Summary judgment is thus granted on the battery claim and the § 1983 claim, as both claims rest
on the theory that Arena shot Corbett. Because the record evidence shows that there is no genuine
dispute that Carter shot Plaintiff, Officer Defendants are entitled to judgment as a matter of law.

**B.    Even if There Was a Genuine Dispute of Fact, the Record is Insufficient to
        Establish a Substantive Due Process Violation.**

As the Court previously described, there is no genuine dispute over who shot Plaintiff.
However, even if Corbett had generated a dispute of material fact as to whether a police officer

fired the shot that struck him or that his injuries were attributable to the police pursuit of Carter, the record evidence still does not establish conduct that shocks the conscience.

42 U.S.C. § 1983 provides "a method for vindicating federal rights." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quotation omitted). It allows suits against any "person" acting under color of state law who subjects the claimant to "the deprivation of any rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983. The Due Process Clause of the Fourteenth Amendment prohibits "any State [from] depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "[T]he Due Process Clause contains a substantive component that bars certain arbitrary, wrongful government actions" and an alleged violation thereof is actionable under § 1983. *Zinermon v. Burch*, 494 U.S. 113, 125 (1990); *see also Wolff v. McDonnell*, 418 U.S. 539, 558 (1974) (noting that "[t]he touchstone of due process is protection of the individual against arbitrary action of government").

The Supreme Court's "cases dealing with abusive executive action," including alleged police misconduct, "have repeatedly emphasized that only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense[.]'" *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (quoting *Collins v. Harker Heights*, 503 U.S. 115, 129 (1992)). Executive conduct must "shock[ ] the conscience" to be an actionable substantive due process challenge. *See id.*; *see also Dean ex rel. Harkness v. McKinney*, 976 F.3d 407, 413–14 (4th Cir. 2020) ("The parties agree that this 'shocks the conscience' standard applies to § 1983 claims alleging a violation of substantive due process based on alleged police misconduct." (citing *Temkin v. Frederick Cnty. Comm'rs*, 945 F.2d 716, 722 (4th Cir. 1991))).

"The Supreme Court in *Lewis* described a 'culpability spectrum' along which behavior may support a substantive due process claim." *Dean*, 976 F.3d at 414 (quoting *Lewis*, 523 U.S. at

848–49). Negligent police misconduct does not shock the conscience and "is categorically beneath the threshold of constitutional due process." *Lewis*, 523 U.S. at 849 (citing, *e.g.*, *Daniels v. Williams*, 474 U.S. 327, 328 (1986)). "[C]onduct intended to injure in some way unjustifiable by any government interest" lies at the other end of the culpability spectrum and is "most likely to rise to the conscience-shocking level." *Id.* (citing *Daniels*, 474 U.S. at 331). This intent-to-harm standard applies "when unforeseen circumstances demand an officer's instant judgment, [such that] even precipitate recklessness fails to inch close enough to harmful purpose to spark the shock that implicates 'the large concerns of the governors and the governed.'" *Id.* at 853 (quoting *Daniels*, 474 U.S. at 332).

In the middle of the spectrum lies conduct that is deliberately indifferent—"'an intermediate level of culpability' that can, if proven, also establish a due process violation." *Dean*, 976 F.3d at 415 (quoting *Lewis*, 523 U.S. at 848–49). "Deliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking." *Lewis*, 523 U.S. at 850. "[U]nlike the intent-to-harm standard, th[e deliberate indifference] standard 'is sensibly employed only when actual deliberation is practical.'" *Dean*, 976 F.3d at 415 (citing *Lewis*, 523 U.S. at 851). "Certainly, time to 'reflect on [one's] actions' is a factor in determining whether deliberate indifference is the appropriate standard." *Id.* (quoting *Browder v. City of Albuquerque*, 787 F.3d 1076, 1082 (10th Cir. 2015)). "[W]hen an officer is able to make unhurried judgments with time to deliberate, such as in the case of a non-emergency, deliberate indifference is the applicable culpability standard for substantive due process claims involving driving decisions." *Id.* (citing *Lewis*, 523 U.S. at 853).

*Lewis* is the Supreme Court's seminal substantive due process case stemming from a police officer's actions during a vehicle pursuit. There, a sheriff's deputy and another officer were in their stopped vehicles having just responded to an unrelated call when they saw a speeding motorcycle carrying two people. *Lewis*, 523 U.S. at 836. One officer activated his emergency lights, yelled for the motorcycle to stop, and attempted to block the motorcycle's path with his car. *Id.* When the motorcycle evaded the police cars and sped off, the other officer activated his emergency lights and siren and "began pursuit at high speed." *Id.* at 837.

> For 75 seconds over a course of 1.3 miles in a residential neighborhood, the motorcycle wove in and out of oncoming traffic, forcing two cars and a bicycle to swerve off the road. The motorcycle and patrol car reached speeds up to 100 miles an hour, with [the officer] following at a distance as short as 100 feet; at that speed, his car would have required 650 feet to stop.

*Id.* As the motorcycle attempted to make "a sharp left turn," it "tipped over" knocking both riders off. *Id.* "By the time [the officer] slammed on his brakes, [the driver] was out of the way, but [the passenger] was not. The patrol car skidded into him at 40 miles an hour, propelling him some 70 feet down the road and inflicting massive injuries." *Id.* That passenger, Lewis, a sixteen-year-old boy, "was pronounced dead at the scene." *Id.* Lewis's parents brought a substantive due process claim under § 1983 on his behalf against the officer who struck him.

A unanimous Supreme Court rejected a finding of liability against the officer under § 1983 for the tragic collision. *Id.* at 855. The Court applied the intent-to-harm standard and found that the pursuing officer did not violate Lewis's Fourteenth Amendment substantive due process rights. *Id.* Specifically, the Court "h[e]ld that high-speed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment, redress[a]ble by an action under § 1983." *Id.* at 854. But in a footnote, the Court observed that there may be a different result if "a citizen suffers or is seriously threatened with

physical injury due to a police officer's intentional misuse of his vehicle." *Id.* at 854 n.13 (citation omitted). With this background in mind, the Court evaluates arguments related to summary judgment on Plaintiff's substantive due process claim.

### 1.    The Intent-to-Harm Standard Applies

The parties disagree which standard applies in this case. The Officer Defendants argue that the intent-to-harm standard applies, relying squarely on *Lewis*. *See* ECF 162, at 10–11. Plaintiff, by contrast, contends that Officer Defendants had time to deliberate, so the deliberate indifference standard applies. *See* ECF 154, at 16–18.

In *Lewis*, the Court made it clear that regarding police actions, "high-speed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment [that is] redress[a]ble by an action under § 1983." 523 U.S. at 854. As the Court explained, the police are often called upon "to act decisively and to show restraint at the same moment, and their decisions have to be made in haste, under pressure, and frequently without the luxury of a second chance." *Id.* at 853 (quotation marks and citations omitted). Thus, "the intent-to-harm standard most clearly applies 'in rapidly evolving, fluid, and dangerous situations which preclude the luxury of calm and reflective deliberation.'" *Terrell v. Larson*, 396 F.3d 975, 978 (8th Cir. 2005) (quoting *Neal v. St. Louis Cnty. Bd. of Police Comm'rs*, 217 F.3d 955, 958 (8th Cir. 2000)).

In urging the Court to apply the deliberate indifference standard, Plaintiff argues that "the chase had already gone on for about six minutes when Plaintiff was shot, and another citizen had been shot three minutes before that." ECF 154, at 17 (citing ECF 147-13, at 7). Plaintiff further contends that "[i]n comparison, the court in [*Dean*] found that a period of only two minutes tended towards finding that the emergency subsided." ECF 154, at 17 (first citing *Dean*, 976 F.3d at 412, then citing *Browder*, 787 F.3d at 1082). Officer Defendants respond that "the instant case involves

six minutes of an *active* emergency wherein two police officers were pursuing an individual believed to have committed a violent felony and who posed a danger to the citizens of Baltimore, without visibility of Foxtrot." ECF 162, at 11 (emphasis in original) (citations omitted).

In *Dean*, the Fourth Circuit confronted when to apply the deliberate indifference standard versus the intent-to-harm standard on a substantive due process claim where the plaintiff was injured in a car accident with a police officer.[10] 976 F.3d at 413. There, the plaintiff's vehicle was struck by a vehicle driven by a defendant deputy sheriff who was travelling at least 83 miles per hour on a dark unlit road which had a speed limit of 45 miles per hour. *Id.* at 412. The deputy sheriff had initially been responding to a call to assist another officer with an emergency, but the emergency call had been terminated prior to the collision. *Id.* at 412, 415–16. The *Dean* court concluded that the deliberate indifference standard applied at the summary judgment stage because a reasonable jury could find that the deputy sheriff "was not responding to an emergency and had time to deliberate his actions." *Id.* at 415–16. Critical to the court's analysis was the fact that after the emergency response was called off, the deputy sheriff deactivated his emergency lights and siren, and over two minutes passed before he collided with the plaintiff's vehicle. *Id.*

*Dean* is easily distinguishable from the instant case because it involved a deputy sheriff "driving a police vehicle without activating his emergency lights and siren at over 80 miles per hour on a curved, unlit road at night while not responding to an emergency or pursuing a suspect." *Id.* at 418. By contrast, here, Officer Defendants were actively pursuing a suspect who fled from the police after a traffic stop and began firing his weapon multiple times out his window. *See* Ex.

---

[10] The Court notes that at least one Circuit has established a bright-line rule regarding which standard applies to high-speed chases. *See Helseth v. Burch*, 258 F.3d 867, 871 (8th Cir. 2001) ("We hold that the intent-to-harm standard of *Lewis* applies to all § 1983 substantive due process claims based upon the conduct of public officials engaged in a high-speed automobile chase aimed at apprehending a suspected offender.").

4, at 16:18:58; *id.* at 16:19:20–44; *see also* ECF 147-3, at 36, 35:19–22. At the time Plaintiff was

shot at 11:24 AM, it is undisputed that Foxtrot did not yet have visibility on the vehicle. *See* Ex.

8, at 03:58–4:05 (depicting Foxtrot arriving on the scene and confirming a visual of Defendant

Carter's vehicle at 11:27 AM). Even assuming some officer back-up had arrived and joined the

chase, as Plaintiff suggests, the Court is nonetheless constrained to conclude that this was an active

emergency in which the officers did not have the luxury of deliberating. *See Waring v. Kraft*, No.

23-cv-5453, 2025 WL 357744, at *4 (D.S.C. Jan. 31, 2025) (finding intent-to-harm standard

applies where defendant was "responding to a 911 emergency call involving an active shooter").

The officers pursuing Carter were forced to make quick decisions under intense pressure. *See*

*Mathis v. Anderson Cnty.*, Civ. No. 22-234, 2024 WL 4486601, at *16 (D.S.C. May 29, 2024)

("[T]he fact that the pursuit in *Lewis* was shorter than the pursuit here is insufficient to warrant a

departure from the intent to harm standard given the totality of the circumstances and the fact that

these defendants were forced to make decisions with competing obligations in haste and under

pressure."). Moreover, Plaintiff has failed to point to any case law in which a court applied the

deliberate indifference standard in the context of a high-speed chase.[11]  Bound by *Lewis* and its

progeny, the Court finds that the intent-to-harm standard applies here.

---

[11] While Plaintiff cites *Browder v. City of Albuquerque* to support his argument, that case is readily
distinguishable from the facts here. In *Browder*, the court applied the deliberate indifference
standard because the officer "used his official squad car and activated its emergency lights and
proceeded to speed through surface city streets at more than 60 miles per hour over 8.8 miles
through eleven city intersections and at least one red light—*all for his personal pleasure, on no
governmental business of any kind.*" 787 F.3d at 1080 (emphasis added). For obvious reasons,
that case is inapplicable to the circumstances here, where the police were engaged in a high-speed
pursuit of an armed suspect shooting his gun out of a moving vehicle.

2.    The Record Evidence Does Not Demonstrate an Intent-to-Harm Unrelated
to Any Legitimate Government Interest.

"[T]here is a long line of cases holding that a police officer's engaging in a high-speed

pursuit, eventually leading to the death of an innocent bystander uninvolved in the pursuit, is not,

by itself, conscience-shocking behavior." *Johnson v. Balt. Police Dep't*, 452 F. Supp. 3d 283,

300–03 (D. Md. 2020) (collecting cases); *see also Graham v. Connor*, 490 U.S. 386, 397 (1989)

("[P]olice officers are often forced to make split-second judgments—in circumstances that are

tense, uncertain, and rapidly evolving."). Police officers' duty is to "restore and maintain lawful

order, while not exacerbating disorder more than necessary to do their jobs. They are supposed to

act decisively and to show restraint at the same moment, and their decisions have to be made 'in

haste, under pressure, and frequently without the luxury of a second chance.'" *Lewis*, 523 U.S. at

853 (first citing *Whitley v. Albers*, 475 U.S. 312, 320 (1986); and then citing *Graham*, 490 U.S. at

397). "A police officer deciding whether to give chase must balance on one hand the need to stop

a suspect and show that flight from the law is no way to freedom, and, on the other, the high-speed

threat to all those within stopping range, be they suspects, their passengers, other drivers, or

bystanders." *Id.* As previously stated, *Lewis* held "that high-speed police chases with no intent to

harm suspects physically or to worsen their legal plight do not give rise to liability under the

Fourteenth Amendment, redress[a]ble by an action under § 1983." *Id.* at 854.

Plaintiff argues that "there are at least two officers who exhibited an intent to harm that

would satisfy the more rigid Eighth Circuit standard." ECF 154, at 15. According to Plaintiff,

"[i]t is quite clear that both Officer Arena and Officer Sentz intended to shoot Carter as soon as

the opportunity presented itself to terminate the case." ECF 154, at 15 (citing ECF 147-6, at 89,

88:11–18; ECF 147-10, at 141–42, 140:1–141:24; *id.* at 144, 143:4–19). As an initial matter, the

body-worn camera footage Plaintiff cites to depict Arena and Sentz's conversation took place *after*

Plaintiff had already been shot. *See* Ex. C (Sentz body camera footage beginning at 11:26 AM);
Ex. D (Arena body camera footage beginning at 11:26 AM). But even if the Court were to consider
Arena and Sentz's comments in the footage as probative of the officers' general intent at the time
Plaintiff was shot, the portions of the deposition testimony cited by Plaintiff make clear that any
intent to shoot was related to a legitimate government objective—namely, self-defense and/or
protection of the public. When asked whether he instructed Arena to be prepared to fire at Carter,
Sentz testified: "I was operating off of the belief that through the officer's observations on the
radio that he was fired upon, that the suspect was armed. I had to take the word from the other
officer on the radio." ECF 147-10, at 141, 140:12–20. Sentz acknowledged that he "had not seen
a weapon," *id.* at 143, 142:21, but clarified that "[j]ust because [he] did not see it didn't mean the
potential wasn't there based on all the facts that the [] other officer communicated that there was
a rifle and that he was fired upon," *id.* at 142, 141:1–5.

Plaintiff also cites deposition testimony by Arena indicating that Arena "recall[ed] [Sentz]
telling [him] to get out of [the] car, or it might have been, like, get ready to get out of the car."
ECF 147-6, at 89, 88:11–13. Arena further clarified that, "there were different points in time where
we thought [] the pursuit was coming to an end. And typically vehicle pursuits usually end in a
car accident or the occupant [] of the vehicle will exit the vehicle and flee on foot[,] [s]o I was
prepared to give chase on foot if that's what the suspect did." *Id.* at 90, 89:4–10. When asked
"[i]f your firearm was in your hand, what would you have used it for," Arena testified, "I would
have myself prepared because this was an armed individual firing gunshots at police officers. So
if . . . he was attempting to use deadly force on myself or my partner, I would return with deadly
force." *Id.* at 89:20–25. On these facts, the Court cannot conclude that the officers' conduct

"intended to injure in some way *unjustifiable by any government interest*."[12] *Lewis*, 523 U.S. at 849 (emphasis added).

Supreme Court precedent in the Fourth Amendment context supports the notion that police officers have a justifiable interest in apprehending a fleeing vehicle after it fails to submit to an officer's attempted stop. *See Scott v. Harris*, 550 U.S. 372, 385 (2007) ("But wait, says respondent: Couldn't the innocent public equally have been protected, and the tragic accident entirely avoided, if the police had simply ceased their pursuit? We think the police need not have taken that chance and hoped for the best . . . First of all, there would have been no way to convey convincingly to respondent that the chase was off, and that he was free to go . . . Second, we are loath to lay down a rule requiring the police to allow fleeing suspects to get away whenever they drive *so recklessly* that they put other people's lives in danger." (emphasis in original)); *California v. Hodari D.*, 499 U.S. 621, 627 (1991) ("Street pursuits always place the public at some risk, and compliance with police orders to stop should therefore be encouraged. Only a few of those orders, we must presume, will be without adequate basis, and since the addressee has no ready means of identifying the deficient ones it almost invariably is the responsible course to comply."). As relevant here, the interest in apprehending the suspect is obviously heightened when the fleeing suspect is verified as armed and actively firing a weapon.

---

[12] In the section addressing intent-to-harm, Plaintiff offers no additional record evidence beyond the deposition testimony. *See* ECF 154, at 14–15. Arena's body-worn camera footage, the authenticity of which is unchallenged, reflects that Arena's weapon was unholstered only after Carter's fleeing vehicle came into view and because Arena believed he might have to exit his police vehicle in the event Carter exited his car. Ex. D., at 16:27:47. Just before Sentz tells Arena to unholster his handgun, the audio reflects an alarm sound consistent with the door of their car opening or a seatbelt being removed. *Id.* at 16:27:45. Sentz is seen on the video emphatically pointing at Arena's holstered weapon and then saying, "get ready with your gun." *Id.* at 16:27:48. It is at this point that Arena's unholstered firearm is first visible. *Id.* at 16:27:52. Shortly thereafter, Sentz tells Arena "[Carter's] going to crash, just be ready, get the fuck out of the car as fast as you can." *Id.* at 16:28:39.

A few additional cases are instructive here. In *Rucker v. Harford County, Maryland*, the Fourth Circuit examined a high-speed chase where a bystander was killed by police officers who were attempting to apprehend a fleeing suspect. 946 F.2d 278, 279–80 (4th Cir. 1991). The Fourth Circuit held that "given the exigencies of the situation, [the officer's] accidental shooting of [plaintiff] would not have constituted the kind of 'oppressive' abuse of governmental power, against which substantive due process gives protection." *Id.* at 282 (citing *Daniels*, 474 U.S. at 331). In reaching this holding, the Fourth Circuit reasoned that "[t]he police, including [] the presumed direct actor, were legitimately [concerned] about the dangerous business of apprehending a madman run amok, threatening the lives of everyone in his way. Given his obvious willingness to injure them or anyone else in order to escape arrest, as evidenced by two near-misses when officers attempted to close with him, they were justified in resorting to the force used to stop his further flight." *Id.* at 281. The Fourth Circuit acknowledged that "it is possible to think of accidental shootings by police in situations of this general type that might be so reckless and irresponsible as to constitute inhumane conduct literally shocking to the conscience (shooting into a crowd at close range, or the like)," but the court ultimately concluded "this is no such situation." *Id.* at 282 (quotation marks omitted).

Similarly, in *Lee v. Williams*, another district court in the Fourth Circuit analyzed a case in which a hostage was shot by sheriff's deputies during a shootout with robbery suspects. 138 F. Supp. 2d 748, 751–52 (E.D. Va. 2001). The court found that "[t]he deputies [] faced a tense, uncertain, and rapidly evolving situation with armed suspects who, after shooting at [one] Deputy at the rear of the store, retreated back into the store, took a hostage, and were attempting to escape in the hostage's van. The deputies were forced to make split-second decisions and to balance 'the need to stop [the] suspect[s] and show that flight from the law is no way to freedom' with the risk

to [plaintiff]." *Id.* at 761 (quoting *Lewis*, 523 U.S. at 853). Ultimately, the court held that "[o]n these facts, no reasonable fact finder could conclude that [the] [d]eputies acted maliciously or sadistically for the very purpose of causing harm to [plaintiff]." *Id.* at 762 (citing *Lewis*, 523 U.S. at 853).[13]

Here, as in *Rucker*, "the police, including [Arena,] the presumed direct actor, were legitimately [concerned] about the dangerous business of apprehending a madman run amok, threatening the lives of everyone in his way."[14] *Rucker*, 946 F.2d at 281. Given Carter's "obvious willingness to injure [the officers] or anyone else in order to escape arrest," *id.*, as evidenced by Carter discharging his weapon within forty seconds of the chase starting, Ex. 4, at 16:19:20–44; ECF 147-3, at 36, 35:19–22, and putting civilians in danger by firing "out the right side of his vehicle," *id.* at 82, 81:1–5,[15] Arena was "justified in resorting to the force used to stop his further flight."[16] *Rucker*, 946 F.2d at 281.

---

[13] Additionally, the case on which *Lee* relies, *Claybrook v. Birchwell*, 199 F.3d 350 (6th Cir. 2000), is also instructive. In *Claybrook*, the plaintiff was injured during a shoot-out between her armed father-in-law and police. *Id.* at 355. During the shoot-out, the plaintiff, unbeknownst to the officers, was in the vehicle and was injured by a stray bullet. *Id.* The Sixth Circuit affirmed the summary dismissal of the plaintiff's substantive due process claims against the police officers, finding that the officers "had no opportunity to ponder or debate their reaction to the dangerous actions of the armed man." *Id.* at 360. Applying the "malicious or sadistic" test for conscience-shocking behavior under the mandate of *Lewis*, the Sixth Circuit held that "even if . . . the actions of the [officers] violated departmental policy or were otherwise negligent, no rational fact finder could conclude . . . that those peace enforcement operatives acted with conscience-shocking *malice* or *sadism* towards the unintended shooting victim." *Id.* (emphasis in original).

[14] Neither party contests Lippe's initial justification for the pursuit. *See* ECF 154, at 22 ("Officer Lippe's conduct in initiating the chase is not at issue.").

[15] Very early on in the chase, Lippe observed pedestrians "ducking on the right side on the sidewalk" to avoid bullets. ECF 147-3, at 82, 81:1–5.

[16] Notably, Plaintiff has not cited a single analogous case, from within or outside the Fourth Circuit, wherein officers' conduct in a high-speed police pursuit of an armed suspect actively firing a weapon was deemed sufficient to meet the shocks the conscience standard. ECF 154, at 15.

Plaintiff maintains that "Rodriguez[17] will testify that Lippe's decision to follow Carter so closely contributed to Carter's tendency to fire at officers while trying to evade them." ECF 154, at 23 (citing ECF 147-8, at 138, 136:10–12 (the "appropriate thing was to back off to make sure that the rounds wouldn't kill someone"); *id.* at 136:18–21 ("the benefit would have been not staying close, which a lot of people were telling Lippe to do that because of the potential of getting injured")). Even assuming this is true, however, Lippe's purported error in judgment when making a split-second decision in an emergency does not constitute arbitrary government action that shocks the conscience.[18]  To survive summary judgment on a substantive due process claim, Plaintiff must provide record evidence that Lippe and Arena "acted maliciously or sadistically for the very purpose of causing harm" to Carter, or to Plaintiff.[19]  *Lee*, 138 F. Supp. 2d at 762 (citing *Lewis*, 523 U.S. at 853).  No such evidence is present here, even assuming that Lippe followed Carter too closely.

A similar argument was rejected by the Supreme Court in *Lewis*.  In *Lewis*, the Court reasoned that the officer

> was faced with a course of lawless behavior for which the police were not to blame.  They had done nothing to cause [the driver's] high-speed driving in the first place, nothing to excuse his flouting of the commonly understood law enforcement authority to control traffic, and nothing (beyond a refusal to call off the chase) to encourage him to race through traffic at breakneck speed forcing other drivers out of their travel lanes. [The driver's] outrageous behavior was practically instantaneous, and so was [the pursuing

---

[17] Rodriguez is Plaintiff's expert. ECF 154, at 10. Plaintiff's filing reflects that the expert's name is Geronimo Rodriguez, *id.*, but the transcript of his deposition provided by the Officer Defendants reflects that his name is Jeronimo "Jerry" Rodriguez, ECF 147-8, at 8.

[18] As Officer Defendants point out, "[t]here is no evidence to support that prior to Foxtrot's arrival, Officers Lippe and Jackson had the 'luxury' of making unhurried judgments but 'fail[ed]' to even care.'" ECF 162, at 17 (quoting *Lewis*, 523 U.S. at 853).

[19] "An officer's actions motivated by an intent to harm a suspect are no less conscience shocking, whether the resulting harm accrues to the intended target (the suspect), or an innocent third party." *Johnson*, 452 F. Supp. 3d at 303 (collecting cases).

> officer's] instinctive response. While prudence would have repressed the
> reaction, the officer's instinct was to do his job as a law enforcement officer,
> not to induce [the driver's] lawlessness, or to terrorize, cause harm, or kill.
> Prudence, that is, was subject to countervailing enforcement considerations,
> and while [the officer] exaggerated their demands, there is no reason to
> believe that they were tainted by an improper or malicious motive on his
> part.

523 U.S. at 855. The same is true here. Officers Lippe, Jackson, Arena, and Sentz were "faced

with a course of lawless behavior for which the police were not to blame." *Id.* The undisputed

evidence shows that Carter sped away from the officers after Lippe asked him to step out of his

vehicle and then Carter started firing a gun out of his vehicle's window within forty seconds of

fleeing, Ex. 4, at 16:19:20–44, which caused pedestrians to start "ducking on the right side on the

sidewalk," ECF 147-3, at 82, 81:1–5. Thus, the Court is satisfied that, as in *Lewis*, Carter's

"outrageous behavior was practically instantaneous," and the Officer Defendants' conduct—

initiating a high-speed chase and Arena allegedly shooting at Carter but inadvertently hitting

Plaintiff—was an "instinctive response" to Carter indiscriminately firing his weapon after fleeing

from the police.[20] *Lewis*, 523 U.S. at 855; *see also Truong v. Hassan*, 829 F.3d 627, 632 (8th Cir.

2016) (finding the defendant "was not acting in a manner to maliciously or sadistically cause [the

plaintiff] physical harm" but rather "[his] actions were related to his legitimate responsibilities").

    While Plaintiff argues that Lippe and Jackson should have called off the chase or not

followed as closely, ECF 154, at 23, *Lewis* makes clear that where the police have "done nothing

to cause [defendant's] high-speed driving in the first place, nothing to excuse his flouting of the

commonly understood law enforcement authority to control traffic, and nothing (beyond a refusal

---

[20] Plaintiff also points to "[a]n investigating detective's statement to [] Carter that the officers
pursing him were 'about to get some hot rounds in his [ass].'" ECF 154, at 16 (citing ECF 147-
18, at 228, 227:10–11). However, even if the Court assumes that the detective's statement is
somehow probative of Arena's state of mind, the Court cannot conclude, given the circumstances,
that the intent to harm was *unrelated* to any legitimate government interest.

to call off the chase) to encourage him to race through traffic at breakneck speed forcing other drivers out of their travel lanes," there is no liability under a substantive due process claim. *Lewis*, 523 U.S. at 855.  This is true "regardless [of] whether [defendant's] behavior offended the reasonableness held up by tort law or the balance struck in law enforcement's own codes of sound practice," *see id.*, because the shocks-the-conscience standard demands more.[21]  *See id.* at 846 ("[O]nly the most egregious official conduct can be said to be arbitrary in the constitutional sense." (quotations marks and citation omitted)).

Plaintiff further argues that "there is evidence to suggest that Officer [] Sentz was involved in the case as early as 11:20 A.M., with his internal lights and sirens on, but without top-mounted lights and sirens as required for officers responding to emergencies under BPD Policy." ECF 154, at 20 (citing ECF 147-10, at 96, 95:10–18).  However, the alleged violation of the BPD vehicle pursuit policy does not change the Court's analysis.  Even where an officer's conduct in a high-speed chase is "disturbing and lacking in judgment," a finding the Court does not make here, the Fourth Circuit has held that it still "falls short of the 'shocks the conscience' standard." *Temkin*, 945 F.2d at 723 (rejecting a substantive due process challenge where plaintiffs asserted that the chase failed to comply with governing police pursuit policy); *see also Lewis*, 523 U.S. at 848 ("[W]e have made it clear that the due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm.").

---

[21] Plaintiff also argues that "[s]hortly after Plaintiff was shot, Officer Lippe's supervisor instructed him to 'just keep [Carter] in sight, let Fox[trot] get there; do not let him get a shot at you; just keep him in sight,' intending for Lippe to hang back and de-escalate the pursuit." ECF 154, at 17 (citing Ex. 4, at 16:24:52–58).  But as Defendants point out, this involves "circumstances occurring after Plaintiff was injured." ECF 162, at 17.  At the time Plaintiff was shot, it is undisputed that there was no Foxtrot visibility, Ex. 8, at 00:42–1:42, and Carter had been shooting multiple rounds out his window while driving erratically at a high-speed, ECF 147-3, at 36, 35:19–22; *id* at 55, 54:7–13.

As the Fourth Circuit acknowledged in *Rucker*, "if the conduct of the assumed direct actor [] does not constitute a substantive due process violation, that of none of the others involved in the chase could." 946 F.2d at 282. The same must be true here: if Arena's conduct did not shock the conscience, the conduct of Lippe, Jackson, and Sentz certainly cannot either. However, for the sake of completeness, the Court will address Plaintiff's argument related to Lippe and Jackson's "self-interest" in the pursuit.

3.   The Record Evidence Related to a Self-Interested Pursuit Does Not Meet *Lewis's* Intent-to-Harm Standard.

As for Officers Lippe and Jackson, Plaintiff appears to concede there is no intent to harm by these two officers, but there was intent to pursue Carter for reasons unrelated to law enforcement objectives. *See* ECF 154, at 15 (arguing that "there are at least two officers [Arena and Sentz] who exhibited an intent to harm" and then arguing in a separate section that Officers Lippe and Jackson were "motivated by self-interest"); *see also id.* ("There is a clear inference that Officer Lippe was motivated by a desire for recognition within the Department as opposed to a selfless attempt to apprehend Carter."). In essence, Plaintiff's argument seizes on the language in *Lewis* in which the Supreme Court affirms "that high-speed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment[.]" *Lewis*, 523 U.S. at 854. Defendants respond that "[t]he only purpose, or intent, relevant for the inquiry is a purpose to harm that is conditioned on being unrelated to the object of arrest," and accordingly, "[a]cting in 'self-interest' is not a purpose to harm." ECF 162, at 13. Even if the Court assumes, as Plaintiff argues, that Lippe was motivated by "pursuit of recognition and selfish desire," ECF 154, at 16, there is no evidence for the Court to conclude that Lippe intended to harm Carter or Plaintiff, as required by *Lewis*. Additionally, the evidence is insufficient to meet the other avenue for relief under the "worsening legal plight" prong of the test, which

courts have repeatedly interpreted narrowly. *See Slusarchuk v. Hoff*, 346 F.3d 1178, 1183 (8th Cir. 2003) ("Rather, we construe the term [worsening legal plight] as applying only to a narrow category of pursuits that reflect a conscience-shocking motive beyond the realm of legitimate government action but do not involve an intent to inflict physical harm.").

While Plaintiff attempts to assign significance to various statements made by law enforcement officers after Carter had been apprehended,[22] this evidence does not show that the officers intended to "induce [Carter's] lawlessness, or to terrorize, cause harm, or kill." *Lewis*, 523 U.S. at 855. To be sure, Lippe's celebration at the end of the chase may strike a viewer as inappropriate given that Corbett (and others) were injured badly in Carter's rampage. However, there is no evidence that at the time of his celebration, Lippe was aware that Corbett, or anyone, had been severely injured in the chase. Further, Lippe had just survived a lengthy and dangerous pursuit during which he was shot at multiple times and was understandably excited. Body-worn camera footage reflects that he was repeatedly congratulated for his work at the scene by other officers of multiple ranks, including by the Police Commissioner himself. Ex. 4, at 17:08:35– 17:11:15. Under these circumstances, Lippe's conduct after Carter's arrest is not probative of intent-to-harm during the time leading up to when Plaintiff was injured. *See McDowell v. Vill. of Lansing*, 763 F.3d 762, 768 (7th Cir. 2014) (finding that "allegations regarding the officer's conduct after [the plaintiff] was injured" did not "shed much light on [the] [o]fficer's [] state of mind in the moments before the [injury]"); *Jones v. Lentine*, Civ. No. 07-12756, 2008 WL 2610245, at *4 (E.D. Mich. June 30, 2008), *aff'd sub nom. Jones v. Byrnes*, 585 F.3d 971 (6th Cir.

---

[22] After the pursuit concluded, Lippe shouted, "This one's mine!" and chest bumped and high-fived Officer Jackson, which was captured on Lippe's bodycam. Ex. 4, at 17:04:00–44. This is an obvious reference to Lippe's desire to be credited for the arrest of Carter and the recovery of firearms from Carter's car.

2009) (granting summary judgment for defendant-officer despite plaintiff's argument that "[d]efendants' self-satisfaction, personal gratification or a desire to harm the suspects borne out of [d]efendants' frustration with the perilous chase" could lead the jury to "infer a purpose to cause harm unrelated to the legitimate object of the chase"); *Eichman v. Rissanen,* 705 F. Supp. 3d 528, 536 (D.S.C. 2023) (rejecting plaintiff's argument that "there is a dispute of fact as to whether [the officer's] response to [the] [d]eputy['s] [] location served a legitimate law enforcement purpose or whether it was the response of an off-duty deputy searching for activity on a slow Sunday evening" because the record evidence shows an active emergency in which available units were asked to respond) (cleaned up).

The Court agrees that "[t]here is no reasonable inference that can be made to suggest that Officer Lippe's recognition attempts, a high-five, and subsequent promotion demonstrate an intent to harm." ECF 162, at 13. This finding is bolstered by the fact that Plaintiff contends that Arena, not Lippe, fired the bullet that struck Plaintiff. In short, the record evidence does not reveal conduct that rises to the level of conscience-shocking, which is necessary to state a substantive due process claim, and in any event, Lippe's post-chase statements and celebration are too attenuated from the actual harm suffered by Plaintiff, given that it is undisputed that Lippe did not shoot Plaintiff.

Similarly, Plaintiff's argument that this "self-interest fits [] with the 'culture' of BPD officers," ECF 154, at 15 (citing ECF 147-8, at 140, 138:16–21), is insufficient to meet the high standard of intent-to-harm. Plaintiff argues that the officers' conduct shocks the conscience because "they subjected the city to [] incredible risk because they believed they would be promoted for their actions, and they were right." ECF 154, at 16. Defendants maintain that "any suggestion that Officer Lippe should have ceased the pursuit of an armed suspected felon, wanted in

connection with a homicide, who was discharging a firearm from his vehicle without Foxtrot present, or increased distance such that visibility could have been lost is untenable as a matter of public policy and is not a common practice under the circumstances." ECF 162, at 22 (citation omitted). The record evidence, even construed in the light most favorable to Plaintiff, does not support an inference that the Officer Defendants acted with an intent to harm anyone unrelated to any legitimate law enforcement interest. As discussed above, the Officer Defendants had a justifiable interest in pursuing Carter after he fled from the police stop. Shortly thereafter, Carter began firing his weapon from the window of his vehicle, which indisputably put civilians in danger. Even if it was Arena who tragically shot Plaintiff during the chase, the chaotic situation was entirely caused by Carter as he sped through the city firing on random cars and at pursuing officers; it was Carter's actions that justify the alleged use of force by Arena. This Court is especially mindful of the Fourth Circuit's guidance that "one must [] take the situation *ex ante*, from the perspective of the state official, and ask whether his or her decisions when he or she made them were of a magnitude to shock the conscience." *Waybright v. Frederick Cnty.*, 528 F.3d 199, 209 (4th Cir. 2008). On these facts, even assuming their truth, the Court cannot hold that Arena's conduct constituted oppressive abuse of governmental power, against which substantive due process gives protection.

Ultimately, while the circumstances of this case are undeniably tragic, there is simply no evidence that Arena intended to harm either Carter or Plaintiff in some way unjustifiable by a legitimate governmental interest. Accordingly, regardless of whether any conduct on the part of Officer Defendants violated the reasonableness upheld by tort law or the balance sought by law enforcement policies and procedures, which are matters for consideration in connection with Plaintiff's state law claims, the Court finds that the fault claimed on Officer Defendants' part does

not meet the shocks-the-conscience test. Furthermore, there being no constitutional violation, the Court also finds that Defendants are entitled to qualified immunity.[23] For the foregoing reasons, even if there was a genuine dispute of fact over who shot Plaintiff, Officer Defendants would nonetheless be entitled to summary judgment with respect to Plaintiff's § 1983 claim because the officers' conduct did not shock the conscience.

### C. Battery Claim

Under Maryland law, "[a] battery occurs when one intends a harmful or offensive contact with another without that person's consent." *Nelson v. Carroll*, 735 A.2d 1096, 1099 (Md. 1999) (citing Restatement (Second) of Torts § 13 & cmt. d (1965)). The touching must be intentional, as "a purely accidental touching or one caused by mere inadvertence[] is not enough to establish the intent requirement for battery . . . The intent element of battery requires not a specific desire to bring about a certain result, but rather a general intent to unlawfully invade another's physical well-being through a harmful or offensive contact or an apprehension of such a contact." *Id.* at 1100–01 (citation omitted). Further, Maryland courts have held that "the doctrine of transferred intent may be applied in a civil claim for battery on legally sufficient facts." *Hendrix v. Burns*, 43 A.3d 415, 430 (Md. App. 2012) (explaining that "[t]he Maryland Civil Pattern Jury Instructions take the doctrine into account, [] stating . . . '[t]he touching need not be directed at the plaintiff; it is sufficient if the touching is directed at another person and as a consequence the plaintiff is touched.'" (quoting MPJI–Cv § 15:3)).

---

[23] Because Plaintiff has failed to establish a violation of his constitutional rights, the Court need not address whether Plaintiff's asserted rights were "clearly established" for purposes of qualified immunity. *See DiMeglio v. Haines*, 45 F.3d 790, 799 (4th Cir. 1995) ("In many cases where a defendant has asserted qualified immunity, dismissal or even an award of summary judgment may be obviously warranted, based upon existing law, without the court ever ruling on the qualified immunity question.").

Defendants argue that the battery claim "should be dismissed as to Officers Lippe, Jackson, and Sentz because Plaintiff makes no contention that any of these officers discharged the firearm that struck him on December 15, 2017." ECF 162, at 5 (citing ECF 154, at 24–26). Plaintiff does not explicitly address Defendants' arguments related to the battery claim. Rather, Plaintiff broadly argues that because there is a genuine dispute as to who shot Corbett, summary judgment is inappropriate. ECF 154, at 24–26. Lippe, Jackson, and Sentz are entitled to summary judgment on the battery claim because there is no dispute that those officers did not cause a harmful or offensive contact to another person. In other words, there is no claim alleging that Lippe, Jackson or Sentz were responsible for firing the bullet or bullets that struck Corbett. Additionally, for the reasons noted above, the Court finds that any claim that Arena shot Corbett amounts to "conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash*, 731 F.3d at 311. Thus, Lippe, Jackson, Arena, and Sentz are all entitled to judgment as a matter of law on the battery claim because the officers did not cause a harmful or offensive contact to Corbett.

### D. Remaining Claims

Having disposed of the constitutional claims against the Officer Defendants, the Court is left with claims against police leadership under a theory of "supervisory liability," ECF 119, at 24 (fifth cause of action), as well as allegations of *Monell* liability for "an express policy" that permitted police pursuits, *id.* at 22 (fourth cause of action), and the alleged "failure to train" officers, *id.* at 27 (sixth cause of action). "It is axiomatic that a *Monell* claim cannot lie 'where there is no underlying constitutional violation by the employee.'" *Tserkis v. Baltimore Cnty.*, Civ. No. ELH-19-202, 2019 WL 4932596, at *4 (D. Md. Oct. 4, 2019) (quoting *Young v. City of Mount Ranier*, 238 F.3d 567, 579 (4th Cir. 2001)). Further, "[n]o actionable claim against supervisors or

local governments can exist without a constitutional violation committed by an employee."
*Anderson v. Caldwell Cnty. Sheriff's Off.*, 524 F. App'x 854, 862 (4th Cir. 2013). As such, these
counts would ordinarily be dismissed. *See Est. of Taylor v. Baltimore Cnty.*, Civ. No. RDB-22-
2459, 2025 WL 385774, at *11 (D. Md. Feb. 3, 2025) (dismissing a *Monell* claim against a county
government defendant without a motion on the grant of summary judgment in favor of individual
officers accused of excessive force). However, since no formal motion has been filed, the Court
orders Plaintiff to show cause as to why these claims should not be dismissed for the reasons noted
above. Plaintiff shall file a response to this memorandum opinion within fourteen days of the date
of this Order, and Defendants BPD, Davis, and Smith shall have one week to respond to any filing
by Plaintiff. If Plaintiff chooses not to respond to this Order to show cause, the Court will dismiss
counts four, five, and six.

The Court also notes that a claim alleging "bodily injury by negligent operation of [an]
automobile" was filed against "insurance company defendants." ECF 119, at 20 (first cause of
action). This count alleges that Plaintiff is entitled to "indemnification of his injuries and costs
from the automobile insurance policy issued to [the driver of the vehicle Corbett was riding in
when he was shot.]" *Id.* at 21. Given the Court's findings as it relates to the Officer Defendants,
Plaintiff must show cause within fourteen days as to why count one should not be dismissed. If
Plaintiff chooses not to respond, this claim will be dismissed.

The claim against Carter alleging battery remains. ECF 119, at 21 (second cause of action).
The Court will address the next steps to be taken as to this claim after it resolves the supervisory
liability, *Monell*, and insurance-related claims.

## IV.    **CONCLUSION**

For the foregoing reasons, Officer Defendants' Motion, ECF 147, is **GRANTED**.  Plaintiff

is ordered to **SHOW CAUSE** within fourteen (14) days as to why Counts One, Four, Five, and

Six should not be dismissed.

A separate implementing Order will issue.

Dated: <u>August 20, 2025</u>

                                        <u>          /s/          </u>
                                        Brendan A. Hurson
                                        United States District Judge